UNITED STATES of America, Plaintiff-Appellee,

v.

Al LEICHTMAN, Salvatore Lombardo, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellant,

v.

Paul LOMBARDO, Defendant-Appellee.

UNITED STATES of America, Plaintiff-Appellee,

v.

Estanley NEIL, Defendant-Appellant.

Nos. 82–5258, 83–5043 and 83–5546.

United States Court of Appeals, Eleventh Circuit.

Sept. 24, 1984.

Rosen & Rosen, Michael J. Rosen, Miami, Fla., for Leichtman, Salvatore Lombardo, Paul Lombardo and Neil.

Michael W. Burnbaum, Asst. U.S. Atty., Miami, Fla., for U.S. in Nos. 82–5258 and 83–5043.

Linda Collins Hertz and James G. McAdams, Asst. U.S. Attys., Miami, Fla., for U.S. in all cases.

Stanley Marcus, U.S. Atty., Miami, Fla., for U.S. in Nos. 83–5546 and 83–5043.

Before GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges.

GODBOLD, Chief Judge:

This case involves a kidnaping conspiracy that grew out of a drug transaction gone sour. The defendants Leichtman, Sal Lombardo, and Neil were convicted by a jury on one count of kidnaping and one conspiracy count. Their co-defendant, Paul Lombardo, was also found guilty on both counts, but the district court subsequently granted his motion for judgment of acquittal. Leichtman, Sal Lombardo, and Neil appeal, and the government appeals from the judgment of acquittal for Paul Lombardo. We affirm the convictions of the three individual appellants and reverse the district court's judgment of acquittal as to Paul Lombardo.

## I. FACTS AND PROCEDURAL HISTORY

Villazon and Leichtman sold on consignment to Bayles, a drug dealer, 5000 pounds of marijuana at $200 per pound. Bayles was expected to repay the $1 million advance after he disposed of the marijuana. After having the marijuana trucked back to his home state of Illinois, Bayles in turn gave Michels, a dealer-associate, 500 pounds on consignment. Bayles left the remaining 4500 pounds stored at a farmhouse in Dongola, Illinois. When Bayles returned to the farm the next day, the 4500 pounds were gone.

After several telephone inquiries from Leichtman about how sales of the marijuana were going and when the $1 million debt would be repaid, Bayles told him that the drugs stored in the Illinois farmhouse had been stolen. Leichtman suggested that Bayles come to Miami where he could work out how he would repay the debt. Bayles did so voluntarily. When he arrived in Miami, Leichtman and Villazon met him at the airport. They held Bayles captive in Miami for the next three weeks. They furnished him with "babysitters," Magic[1] and Sal Lombardo, who kept him under constant guard. Villazon and Leichtman obtained partial repayment from assets that Bayles signed over to them.[2] These assets did not come close to discharging Bayles' debt, however, so Bayles was not released.

After he had been held captive for about three weeks, Bayles suggested to Leichtman and Villazon that if he were permitted to return to Illinois, he could obtain from Michels $40,000 that Michels owed him for marijuana and about 2500 pounds of marijuana that belonged to others. Agreeing to the plan, Leichtman told Bayles that if he

---

1. According to the government's brief "[a]lso indicted were Al Engel, Anthony Villazon, Paul Santos, John Doe, a/k/a Bronco, and Joe Doe, a/k/a Magic. Paul Santos was found not guilty of all counts and discharged. The remaining named defendants have each been convicted of one or both substantive counts and the conspiracy count, which convictions are currently subject of separate appeals."

2. At Leichtman's and Villazon's insistence Bayles had his attorney in Illinois make out quitclaim deeds to his Illinois property and send them to Miami. Bayles signed the deeds over to Leichtman and Villazon in the presence of their attorney, Irving Shulman, who notarized them. Taking into account mortgages, the properties were worth about $100,000.

succeeded in getting the money and marijuana, they would let him go. Villazon threatened to kill him if he failed.

In accordance with this plan, Sal Lombardo and Santos took Bayles by car to Chicago. There they contacted Michels, who told them that the marijuana they sought was in Springfield, Illinois and that the money was in Michels' home town of Moline, Illinois. Michels saw the fear in Bayles' eyes, and could tell that Bayles was scared of what might happen if he could not pay off the debt. When Sal requested that Michels accompany them to Springfield, he reluctantly agreed to go. Before leaving Chicago, Sal and Santos made long distance calls to Miami to tell Leichtman their plans and obtain instructions.

Sal, Santos, Bayles, and Michels proceeded to Springfield in one car. Ultimately they were unsuccessful at obtaining marijuana from either of the two stash houses that Michels had suggested they try.[3] Sal called Miami several more times. The four eventually decided that Michels would fly from Springfield to his home in Moline, Illinois to get the $40,000 he owed Bayles; he then would send it to Bayles' "creditors." Sal, Santos, Bayles, and Michels headed toward the airport. Within a mile from the airport, Sal stopped at a pay telephone and called Miami again. After the call, Sal started driving the car in the opposite direction of the airport. When Michels inquired why, Sal said, "We're not going to the airport. You're going for a ride with us. You're going down South. You sit still and behave." Rec. at 6:48. When Michels said he did not want to go, Sal told him again that he was going for a ride. Sal said he was taking Bayles and Michels to Florida and that it was Leichtman who had instructed this. Michels felt that he had no choice in the matter.

The four drove straight through to Miami, stopping only for food and gas. Once they arrived, Bayles and Michels were taken to the apartment where Bayles had been held captive before. Leichtman and Villazon arrived shortly with aluminum baseball bats. They beat Bayles and Michels across the shins and interrogated Michels about his suspected role in the theft of the 4500 pounds of marijuana. Michels was also questioned several times about his assets. Neil had Michels write down a list of his assets and made arrangements for Michels to have two trucks delivered to the creditors as part payment for Bayles' debt. Michels' fiance personally brought $9,000 from Moline, Illinois that she turned over to Leichtman and Villazon. She also delivered titles to several of Michels' vehicles and turned over Michels' boat.

Altogether, Bayles and Michels were held about three and a half weeks in the apartment. They were kept tied up most of the time and were guarded on a rotating basis by Sal, Magic, and Neil. Paul Lombardo, visiting his brother from Tucson, Arizona, stayed with them at the apartment and participated in guard duty. Bayles' and Michels' treatment got progressively worse. They were fed less and less often, and eventually were down to one meal per day, usually a bowl of cereal. Each lost about 25 to 30 pounds. Bathing was permitted only infrequently.

Near the end of their captivity, the guards lost patience with them and beat Bayles severely in an attempt to find out about the missing marijuana. Sal and Paul Lombardo and several unknown men gagged Bayles and beat him with their fists and a baseball bat. Sal told Bayles that it was Bayles who was responsible for

---

**3.** The four went to a stash house in rural Springfield at which Michels' marijuana was kept. When the "guard" at the house refused to let them take the marijuana, Sal called Leichtman in Miami for instructions on what to do next. On getting off the phone, Sal informed Bayles and Michels they were going to take the marijuana even if it required killing the guard. It was only when they learned that the guard

was not the only person at the stash house that they left without taking further action.

The next morning, Michels called a second stash house that warehoused marijuana for him and other dealers. Persons there had been tipped off that something was up, however, and warned Michels that if he and his companions showed up, they would be shot. The four made no attempt to visit the second location.

the loss of the $1 million and that he was going to get to the bottom of it. Sal told him that he had gotten the green light from Leichtman to do what was necessary. Paul told Bayles that he doubted the credibility of Bayles' story, that he believed Bayles was involved in the theft of the marijuana, and that they were going to beat Bayles until they got the story.

Shortly after this beating Bayles overheard Leichtman tell someone that he was going to turn Bayles and Michels over to his superiors in a few days. At this point Bayles feared for his life, and he and Michels discussed the possibility of escaping.[4] Late the next night they untied their ropes and escaped through a bedroom window while Neil, their guard, was asleep in the living room. They ran several miles, stopping finally at a house where lights were on. From there they called the police. The two recounted their travails to the authorities, and this prosecution resulted.

The grand jury subsequently indicted Leichtman, Villazon, Neil, Sal and Paul Lombardo, Santos, and three others on one count of kidnaping conspiracy and two substantive counts of kidnaping, one for kidnaping Bayles and one for Michels. Villazon and the three other people were not apprehended prior to trial, so only Leichtman, Neil, the two Lombardos and Santos were tried together. The jury acquitted Santos of all three counts. The remaining defendants were acquitted of Count II, the kidnaping of Bayles, and convicted of conspiracy and kidnaping of Michels. The court denied the post-trial motions of all defendants except Paul Lombardo.

Issues on appeal are: (1) whether the district court abused its discretion in permitting extensive testimony and prosecutorial argument about the marijuana aspects of the case; (2) whether the district court erred in refusing to give a limiting instruc-

tion that consideration of the marijuana evidence was limited solely to motive; (3) whether the court erred in admitting the marijuana evidence against Sal Lombardo and Neil; (4) whether the court erred in denying Leichtman the opportunity to introduce exculpatory evidence; and (5) whether the evidence against Paul Lombardo and Neil was sufficient to sustain their convictions.

## II. SUFFICIENCY OF THE EVIDENCE AGAINST NEIL AND PAUL LOMBARDO

To prove that Neil and Paul Lombardo were guilty of conspiracy the government's evidence had to prove beyond a reasonable doubt that an agreement existed between two or more persons to commit the crime of kidnaping, that the defendants knowingly and voluntarily joined or participated in the venture, and that an overt act was committed by at least one of their co-conspirators in furtherance of the kidnaping conspiracy. *U.S. v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983). The law does not require that each defendant have knowledge of the participation of others; the government need only prove that the defendant knew the general nature and scope of the conspiracy. *U.S. v. Clark*, 732 F.2d 1536, 1539 (11th Cir.1984). A defendant may be found guilty of conspiracy even if he did not join it until after its inception and even if he played only a minor role in the total scheme. *Id.* at 1539–40. The evidence is sufficient to satisfy this test for both Neil and Paul Lombardo.

Neither Neil nor Lombardo disputes that a conspiracy existed the object of which was to kidnap and detain Michels. Rather their contention is that the government has failed to prove the element of knowledge of the nature and scope of the conspiracy.[5] Both assert that if they are

---

**4.** After an earlier escape attempt by Bayles, Michels and Bayles had been warned by Leichtman that if they attempted to escape again, he would go after their families.

**5.** The defendants were charged with violating 18 U.S.C. § 1201 (1976 & Supp. V 1981), which provides in relevant part:

    Sec. 1201. Kidnaping

      (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries

guilty of anything it was false imprisonment and that they lacked the necessary knowledge that they were joining a conspiracy with kidnaping as its object.

There is plentiful circumstantial evidence supporting the inference that Neil and Paul Lombardo knew of the kidnaping objective. Both acted as guards for Bayles and Michels. Thus they knew that Bayles and Michels were being held hostage against their wills. Both supervised the victims while they made long distance calls, primarily to Illinois, when attempting to round up their assets. Both knew that the victims were from another state, Illinois. Finally, both participated in the attempts to collect the "ransom." Neil questioned Michels extensively about his assets and even flew out to Kirksville, Missouri to drive back two of Michels' trucks. Paul Lombardo participated in a beating of Bayles that included an interrogation session directed to finding out whether Bayles had been involved in the theft of the 4500 pounds of marijuana and, if so, where the drugs were.

This evidence was adequate to permit a reasonable jury to conclude beyond reasonable doubt that Neil and Paul Lombardo had knowingly joined a kidnaping conspiracy. Their active involvement in forcible detention and attempts to collect ransom was a sufficient basis from which the jury could have inferred that they knew of the conspiracy's ultimate objective. *See U.S. v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (Unit B) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983) (evidence is sufficient if, when viewed in light most favorable to government, it permits reasonable trier of fact to conclude that all of the elements of the offense have been proven beyond a reasonable doubt).

We reach a similar result on the substantive offense of kidnaping Michels. As members of the kidnaping conspiracy Neil and Lombardo can be held responsible for the substantive offenses committed by their co-conspirators in furtherance of the conspiracy. *U.S. v. Blasco,* 702 F.2d 1315, 1330 (11th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 275, 78 L.Ed.2d 256 (1984). The evidence overwhelmingly shows that Michels was kidnaped by Sal Lombardo and taken from Springfield to Miami. That kidnaping took place under instructions from Leichtman. When Neil and Paul Lombardo aligned themselves with the conspiracy, they became responsible for the kidnaping committed by their co-conspirators.

## III. THE MARIJUANA EVIDENCE

### A. *The Extent of the Testimony and the Prosecutor's Argument about the Marijuana Context of the Kidnaping*

Neil, Leichtman, and Sal Lombardo complain that the prosecutor's references to the marijuana transaction in his opening and closing arguments and the witnesses' testimony about the transaction unfairly prejudiced them in the eyes of the jury. This contention is best viewed as two separate claims: (1) prosecutorial misconduct, and (2) admissibility of the marijuana evidence. Both claims lack merit.

Determinations about the admissibility of evidence rest largely within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion. *U.S. v. Russell,* 703 F.2d 1243, 1249 (11th Cir. 1983). The defendants contend that the admission of evidence concerning the mari-

away and holds for ransom or reward or otherwise any person ... when:
    (1) the person is willfully transported in interstate or foreign commerce;
    ....
shall be punished by imprisonment for any term of years or for life.
    ....
    (c) If two or more persons conspire to violate this section and one or more of such

persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.

Knowledge of crossing state lines is not an essential element of the kidnapping offense. The requirement that an offender cross state lines merely furnishes a basis for the exercise of federal jurisdiction. *U.S. v. Bankston,* 603 F.2d 528, 532 (5th Cir.1979).

juana aspects of the case was an abuse of discretion because it concerned an extrinsic criminal offense that was inadmissible under both Fed.R.Evid. 403 and 404(b).[6] They suggest that the trial court could simply have instructed the jury at the start of the trial that Bayles was indebted to Leichtman and Villazon for the sum of $1 million and thereby avoided prejudicing their trial defense.

The marijuana evidence was not evidence of an extrinsic offense. As we have previously indicated, "evidence of an uncharged offense arising out of the same transaction or series of transactions as the charged offense is not an 'extrinsic' offense within the meaning of Rule 404(b)." *U.S. v. Kloock,* 652 F.2d 492, 494 (5th Cir. 1981) (Unit B); *see U.S. v. Killian,* 639 F.2d 206, 211 (5th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *U.S. v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979); *see also U.S. v. McCrary,* 699 F.2d 1308, 1311 (11th Cir.1983) ("other crime" evidence admissible if "inextricably intertwined with the evidence used to prove the crime charged"). Evidence of the original marijuana transaction was necessary to complete the story of the kidnaping. It explained the motive of the defendants; it put the trip from Miami to Springfield in context; it evidenced the pre-existing debt and thereby corroborated the victims' story that their ransom was $1 million in drugs or money.

The marijuana evidence was also inextricably intertwined with the facts of the crime charged, particularly with what went on in Springfield. The facts immediately preceding the abduction were critical to the prosecution's case, since the government had to show an unconsenting seizure of Bayles and Michels in Springfield, as alleged in the indictment. No physical force was used to accomplish the abduction; nor were the victims threatened with weapons at the time when Sal Lombardo announced that their plans had changed and they were going to Miami. Bayles and Michels had been present at the first stash house, however,[7] and had heard Sal's plan to take the marijuana there by force, even if it meant killing the person guarding it. The assertion that Sal would kill to obtain the marijuana was probative of Bayles' and Michels' later mental state when they acquiesced in Sal's announcement that the two were going to Florida whether they wanted to or not; it could not have been excluded as extrinsic crime evidence without substantial injury to the government's case on the kidnapping charge.

Finally, evidence about the marijuana aspects of the case was relevant to the "holding for ransom" element of the kidnaping offense. Before Sal Lombardo and Santos took Bayles back up to Illinois, Leichtman had offered to let Bayles go if he could obtain $40,000 and 2500 pounds of marijuana. Later, when Bayles was beaten at the hands of Paul and Sal Lombardo, they repeatedly demanded to know from him where the stolen marijuana was. The record clearly indicates that the defendants were equally willing to take cash or marijuana to pay off Bayles' debt, and that willingness was a consideration for the jury on the ransom issue. Thus we conclude that the marijuana evidence was inextricably intertwined with the evidence necessary to prove the crime charged, and was not "other crime" evidence within the meaning of Fed.R.Evid. 404(b).

The marijuana evidence was not inadmissible under Fed.R.Evid. 403 because its probative value was outweighed by its prejudicial effects. We have described its proba-

---

**6.** Fed.R.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 403 provides in relevant part:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . .

**7.** *See supra* note 2.

tive value, which outweighed prejudicial effect.

█ The prosecutor's references to the marijuana transaction in his opening and closing arguments did not prejudice defendants' right to a fair trial. Viewing the record as a whole, and considering the admissibility of the evidence on which the prosecutor was commenting, there was no prejudice that affected the substantial rights of the defendants. *See U.S. v. Tillman,* 680 F.2d 1357, 1359 (11th Cir.1982) (per curiam).

## IV. FAILURE TO GIVE LIMITING INSTRUCTIONS ON THE MARIJUANA EVIDENCE

For reasons already set out, the trial judge did not err in refusing defendants' requested instructions limiting the marijuana evidence to proof of motive.

█ Pretermitting whether this ground for appeal was properly preserved below, we hold that the court did not reversibly err in not instructing the jury that the marijuana evidence was inadmissible against Sal Lombardo and Neil. The evidence was admissible against Sal Lombardo, who indicated by his actions and statements while in Springfield that he would take marijuana back to Miami as payment on Bayles' debt. If error as to Neil, it was harmless. Other evidence of his participation in the conspiracy was substantial, and the jury could find him liable based on the evidence against his co-conspirators.

## V. LEICHTMAN'S EXCULPATORY EVIDENCE

Subsequent to his arrest, co-defendant Santos gave police a statement in which he said that Villazon had contacted him and arranged that he ride with Sal and Bayles to Chicago. Santos said that the three returned to Florida with Michels so that Bayles and Michels could straighten out the problem they had with Villazon. Santos denied any further involvement. Leichtman sought to introduce the statement in his defense. When the court de-

nied admission because of the *Bruton* problems it posed, *see Bruton v. U.S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Leichtman moved for severance on the ground that he could get Santos to testify to this at a separate trial. Severance was denied. Leichtman then advised the court that he intended to call Agent Davis, who had taken the Santos statement, in order to elicit the statement. The court permitted Leichtman to call Davis but limited the scope of direct examination to whether, in the course of conversations between Davis and Santos, Santos had ever mentioned Leichtman's name. Davis testified that he did not recall that Santos had.

█ Leichtman contends that he should have been granted a severance so that he could introduce Santos' testimony as exculpating evidence. Second, he says the court abused its discretion in limiting the direct examination of Davis. A defendant who moves for a severance in order to obtain a co-defendant's favorable testimony must show (1) a bona fide need for the testimony, (2) the substance of what the desired testimony would be, (3) its exculpatory nature and effect, and (4) that the designated co-defendant would in fact testify at a separate trial. *U.S. v. Hewes,* 729 F.2d 1302, 1319 (11th Cir.1984). Once these requirements have been met, whether to grant a severance is a matter within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *U.S. v. Clark,* 480 F.2d 1249, 1252 (5th Cir.), *cert. denied,* 414 U.S. 978, 94 S.Ct. 301, 38 L.Ed.2d 222 (1973). We concur in the district court's conclusion that the proffered testimony did not exculpate Leichtman, and therefore severance was not required. Santos' statement strongly inculpated Villazon, but there was nothing exculpatory about Leichtman contained in the statement. Leichtman's name was not even mentioned, and the mere inculpation of Villazon in some aspects of the transaction was not enough to render the statement exculpatory as to Leichtman. There was no abuse of discretion.

606

We also affirm the trial judge's limitation of Leichtman's direct examination of Agent Davis. Leichtman does not dispute that Santos' statement would have created serious *Bruton* problems for some of his co-defendants. Admission of the statement at trial would have been reversible error as to those other defendants. The trial court ruled that this problem was not solvable through redaction of the statement because of the likelihood that the jury would infer the identity of the unnamed defendants. Our examination of the prior witnesses' testimony and Santos' statement confirms this conclusion.

The convictions of Leichtman, Sal Lombardo, and Neil are AFFIRMED. The judgments of acquittal as to Paul Lombardo are REVERSED with direction to enter judgments of conviction on Counts I and III.