UNITED STATES of America,
Plaintiff-Appellee,

v.

Victor MACHADO, Miguel Angel Victorero, Edgardo Rafael Manotas, Fernando Gaviria-Aguirre, Defendants-Appellants.

No. 84–5741.

United States Court of Appeals,
Eleventh Circuit.

Dec. 3, 1986.

Manuel Mari, Romaguera & Mari, P.A., Coral Gables, Fla., for Machado.

Theodore J. Sakowitz, Federal Public Defender, Miguel Caridad, Asst. Federal Public Defender, Miami, Fla., for Victorero.

Samuel I. Burstyn, Michel Ociacovski Weisz, Miami, Fla., for Manotas.

Leon B. Kellner, U.S. Atty., Robert F. Dunlap, David O. Leiwant, Nancy L. Worthington, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Reemberto Diaz, Diaz & Batista, Hialeah, Fla., for Gaviria-Aguirre.

Before RONEY, Chief Judge, KRAVITCH, Circuit Judge, and ATKINS *, Senior District Judge.

## CORRECTED OPINION

KRAVITCH, Circuit Judge:

This appeal involves four of five defendants who were tried jointly for drug related offenses. Appellant Edgardo Rafael Manotas was convicted of: conspiring to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count 1); possessing cocaine on January 4, 1984, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); and possessing cocaine on January 6, 1984, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 3). In addition to convictions on the first three counts, appellant Miguel Angel Victorero was convicted of unlawfully carrying a firearm during the commission of a felony, in violation of 18 U.S.C. § 924(c)(2) (Count 4). Appellant Fernando Gaviria-Aguirre was convicted on Counts 1–3 and carrying firearms unlawfully during the commission of a felony, in violation of 18 U.S.C. § 924(c)(2) (Count 5). Finally, appellant Victor Machado was convicted on counts one and three.

In addition to challenging the sufficiency of the evidence, appellants' other issues on appeal include: (1) whether coconspirator statements were erroneously admitted as to appellant Manotas; (2) whether admitting coconspirator statements against Manotas constituted a denial of sixth amendment confrontation rights; (3) whether denial of Manotas's severance motion was an abuse of discretion; (4) whether limitations imposed by the trial judge on the scope of cross-examination of the key government witness was an abuse of discretion; (5) whether the trial court erred in denying appellant Gaviria-Aguirre's motions for judgment of acquittal on the charges of carrying a weapon in the commission of a felony and conspiracy to possess cocaine with intent to distribute. We find no reversible error in the trial court's careful and patient handling of this case. We therefore affirm.

## I. BACKGROUND

The chain of events that led to the convictions began on December 8, 1983, when Paolo Longo visited his former co-employee Carlos Muñoz to suggest that if Muñoz wanted to make a lot of money, Longo could supply him with anywhere from one to a thousand kilograms of cocaine. Longo told Muñoz to contact him if he succeeded in locating some buyers. After Longo left, Muñoz contacted an agent at the Bureau of

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

Alcohol, Tobacco and Firearms,[1] who introduced Muñoz to Agent Jacobsen of the Department of Drug Enforcement Administration (DEA). In exchange for cooperating with the DEA in arranging a purchase of cocaine, Agent Jacobsen promised to appear on Muñoz's behalf at resentencing hearings on Muñoz's outstanding criminal conviction.[2]

The first of the appellants to enter the story was Miguel Angel Victorero. On December 15, 1983, Victorero accompanied Longo to the automobile dealership where Muñoz worked. Longo introduced Victorero to Muñoz and inquired as to whether Muñoz had contacted any buyers. The next day, Longo telephoned Muñoz to notify him that Longo was returning to Muñoz's place of employment. DEA agents prepared for this meeting by establishing a surveillance of Muñoz's workplace and attaching a recording device to Muñoz. Victorero was present when Longo told Muñoz that if Muñoz needed any cocaine he could call "John" who would give the cocaine to Victorero, who in turn would bring it to Muñoz. Longo described how Muñoz would then give the money to Victorero, Victorero would deliver the money to John, and Victorero would bring more cocaine later if Muñoz desired. After this meeting, DEA agents instructed Muñoz to delay the deal until after January 1, 1984.

The next meeting occurred on December 22, 1983, again at Muñoz's place of employment. As before, Longo arrived with Victorero and inquired as to whether Muñoz was ready to make the deal. Longo advised Muñoz that he would be out of town for the holidays but that he would leave one kilogram of cocaine either with Muñoz or with John. Muñoz told Longo that he did not want any cocaine in his place of business and that he would call when he

was ready to deal. Longo once again told Muñoz that if Muñoz wanted to contact John, Victorero would serve as a middleman. Longo commented that if Muñoz didn't give Victorero the money, Victorero "knows what to do." Victorero laughed and nodded.

The first sale of drugs was arranged on January 3, 1984 at the automobile dealership where Muñoz worked. Victorero accompanied Longo to the meeting and was present throughout. Longo agreed to deliver one kilogram of cocaine to Muñoz on January 4, 1984 for a price of $25,000. The exchange was to occur at 3:00 p.m. in the parking lot of the Midway shopping mall, near a department store.

On January 4, Muñoz went to the designated location with $25,000 in DEA cash stuffed in his pocket.[3] When Longo failed to appear, Muñoz telephoned him. Longo promised to meet Muñoz later at the same shopping mall location. When Longo arrived, Muñoz got in Longo's car and they drove to a bank of telephones where Longo dialed a number and spoke to someone named "Fernando." Muñoz heard Longo tell Fernando that the money and the people were ready and that they were very upset about the delay. Fernando then asked to speak with Muñoz. Fernando apologized to Muñoz for the delay and promised that there would be no delays the next time and that Muñoz could be sure that his delivery was going to be no later than 7:00 p.m. that evening. Muñoz then passed the receiver back to Longo and heard Longo say "Coral Way and 87th Avenue, Playworld. It was to be in a Camaro." After driving Muñoz back to his car, Longo left.

It was at this point that appellant Edgardo Rafael Manotas entered the story. DEA agents followed Longo's Mercedes as

1. Muñoz had worked as a confidential informant for the Bureau of Alcohol, Tobacco and Firearms since 1983.

2. In connection with the Mariel boatlift, Muñoz was convicted in 1981 and sentenced to 32 months imprisonment for bringing illegal aliens into the United States. Agent Jacobsen promised to appear on Muñoz's behalf at reduction of

sentence hearings and to recommend that Muñoz be granted probation.

3. The DEA had photocopied the $100 bills and recorded their serial numbers. Agent Jacobsen examined the money and found it was all intact prior to the 5:00 meeting.

he left the Midway mall area and proceeded to the Playworld mall. Upon arriving at the Playworld mall area, Longo, carrying nothing in his hands, left his vehicle and walked to an area in the mall where he met Manotas. Longo and Manotas entered a 1983 Chevrolet Camaro.[4] Manotas drove the Camaro to the area where Longo's Mercedes was parked and Longo exited carrying a white plastic bag.

Longo immediately proceeded back to the Midway mall area where he met with Muñoz. Longo placed a brown paper bag containing a plastic bag with one kilogram of cocaine in it into Muñoz's car and Muñoz gave Longo the $25,000.[5] Longo and Muñoz agreed to meet the next morning in the parking lot of a department store where Longo would sell Muñoz fifty kilograms of cocaine. When Longo left, DEA agents followed him to a restaurant where Longo made some telephone calls and met with appellant Manotas who arrived in the Camaro he had been driving earlier.

The next day, Muñoz learned that the fifty kilogram deal would be delayed. Early that morning, Longo telephoned Muñoz to cancel the 9:00 a.m. meeting. Later that afternoon, Muñoz met with Longo at the designated department store parking lot but Longo declared that the deal was off for that day because he was concerned about some suspicious cars driving around the area.

Around 7:00 p.m., Longo called to arrange a meeting behind a restaurant in Hialeah. Muñoz informed the DEA agents and went to the meeting. When he arrived, Longo approached his car and told Muñoz to wait there because "the Colombians, the men who had the cocaine would like to talk to us right there." Approximately ten minutes later, two men drove up in a blue sports car. Appellant Fernando Gaviria-Aguirre got out of the car and met

with Longo and Muñoz. Gaviria-Aguirre apologized to Muñoz for the delay in the first deal and promised that the fifty kilogram deal would occur the next day and it would be sharp, with no more mistakes. Muñoz was introduced to Cabrera, the driver of the car and the man "who owned the merchandise." The deal was set for 10:00 a.m. in a shopping center parking lot.

On January 6, 1984, both sides prepared for the fifty kilogram deal. Sometime prior to 10:00 a.m., Maritza Rodriguez, appellant Victor Machado, and an unidentified male rented a U-Haul truck from a service station in Hialeah.[6] Meanwhile, DEA agents in a surveillance van at the shopping center parking lot observed Victorero conducting counter-surveillance by walking up and down the aisles of parked cars and peering inside of them. Victorero was carrying a handbag that contained a gun. When Muñoz arrived at the shopping center at 10:00, Longo invited him to walk to a nearby shop to drink Cuban coffee. Appellant Gaviria-Aguirre drove up in a rental car with his infant son and met Muñoz and Longo when they returned to the parking lot.

Gaviria-Aguirre told Muñoz that the "merchandise" was inside a U-Haul truck parked facing the street at a nearby location and Longo then drove Muñoz in Gaviria-Aguirre's rental car to the U-Haul truck. Machado and the unidentified male were waiting at the U-Haul. Machado admitted that they were "Fernando's men." Muñoz went inside the back of the truck and inspected the approximately ten kilograms of cocaine.

Longo and Muñoz then returned to the parking lot where Gaviria-Aguirre was waiting. Muñoz signalled the DEA agents and Gaviria-Aguirre, Longo, and Muñoz were all placed under arrest. Victorero emerged from a nearby bakery and was

---

4. The Camaro was registered to appellant Manotas's wife.

5. Inside the plastic bag was a blue box which contained a "football" inside of which was approximately one kilogram of cocaine.

6. The record indicates that Maritza Rodriguez and Machado lived in the same apartment. Machado was Gaviria-Aguirre's brother-in-law. Gaviria-Aguirre's wife sometimes paid the rent on the apartment.

arrested after he attempted to flee. The agents seized Victorero's handbag containing the handgun and searched Gaviria-Aguirre's rental car. They discovered two handguns on the floor on the passenger side, partially under the seat.[7] Victorero, while riding in the DEA van, unsuccessfully attempted to hide a set of keys to Longo's automobile.

DEA agents then arrested appellant Machado and seized the ten kilograms of cocaine in the U-Haul. Agents had Manotas's Camaro towed away from his home later that night. The next morning when Manotas called the police to report the vehicle stolen, DEA agents went to Manotas's home and arrested him.

## II. ADMISSION OF COCONSPIRATOR STATEMENTS AGAINST APPELLANT MANOTAS

Appellant Manotas argues that the trial court erred in admitting coconspirator statements under Fed.R.Evid. 801(d)(2)(E). Appellant concedes that a conspiracy existed and that the coconspirator statement,[8] if made, was made in furtherance of and during the course of the conspiracy. Appellant challenges, however, the sufficiency of substantial independent evidence under *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), to show that he was a member of the conspiracy.

In *James*, our predecessor court [9] set out the test for admissibility of coconspirator statements under Fed.R.Evid. 104(b). Under the *James* standard, in order for the trial judge to allow the jury to consider coconspirator statements offered against a defendant under Fed.R.Evid. 104(b), the court must find by a preponderance of the evidence independent of the statement itself: (1) that a conspiracy existed; (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy; and (3) that the statement was made during the course and in furtherance of the conspiracy. *Id.* at 582. The trial court's determination on the *James* issue will not be overturned unless clearly erroneous. *United States v. Alvarez*, 755 F.2d 830, 855 (11th Cir.1985); *United States v. Zielie*, 734 F.2d 1447, 1457 (11th Cir.1984), *cert. denied*, 469 U.S. 1189, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Castro*, 723 F.2d 1527, 1533 (11th Cir.1984); *United States v. Bulman*, 667 F.2d 1374, 1379 (11th Cir.), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). Even if the *James* requirements are not satisfied and the coconspirator hearsay is improperly admitted, the admission may constitute harmless error. *United States v. Weinstein*, 762 F.2d 1522, 1535 (11th Cir.1985).

In reviewing the independent evidence in this record, we are not left with a " 'definite and firm conviction that a mistake has been committed'  that makes it necessary to overturn the district court's determination as clearly erroneous." *Bulman*, 667 F.2d at 1379 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)) (citation omitted); *Castro*, 723 F.2d at 1533. Independent evidence indicated that after arranging a one kilogram sale with Muñoz, Longo met with Manotas. Longo entered Manotas's automobile with nothing in his hands. Several minutes later, Longo emerged holding a white plastic bag. Agents then observed Longo drive back to a meeting with Muñoz where Longo delivered a brown paper bag to Muñoz. Inside

---

7. One of the handguns was inside a leather suede pouch. The other gun was found on top of the pouch.

8. The challenged statement was Longo's remark during the telephone conversation with "Fernando" regarding "Coral Way and 87th Avenue, Playworld. It was to be in a Camaro." Mano-

tas, driving a Camaro, met with Longo at that location.

9. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

the bag was a white and blue plastic bag containing one kilogram of cocaine. After receiving $25,000 from Muñoz, Longo drove to a restaurant where he met for about thirty minutes with Manotas.

Although appellant correctly points out that no one actually observed him deliver the cocaine to Longo or receive the $25,000, the trial judge did not commit clear error in finding that a preponderance of substantial independent evidence supported the conclusion that appellant Manotas was a member of the conspiracy to possess cocaine with intent to distribute. Appellant's attempt to distinguish our prior cases on the basis of the direct involvement of each defendant in the cocaine transaction is unpersuasive. This is not a case of "mere association with persons involved in a criminal enterprise." *United States v. DeSimone,* 660 F.2d 532, 537 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982); *United States v. Stanley,* 765 F.2d 1224, 1243 (5th Cir.1985). Substantial independent evidence in this case supported the conclusion that appellant Manotas *personally* delivered a kilogram of cocaine to Longo and received $25,000 in payment.[10]

## III. DENIAL OF CONFRONTATION RIGHTS BY ADMISSION OF CO-CONSPIRATOR STATEMENTS

Manotas further argues that introduction of out of court coconspirator statements under Fed.R.Evid. 801(d)(2)(E) denied him his sixth amendment right to confront adverse witnesses. Manotas contends that the sixth amendment is violated when hearsay evidence is admitted against a criminal defendant even though the evidence is admissible under an established hearsay exception when: (1) the evidence is "inherently unreliable"; (2) the evidence is devastating to the defendant's case and critical to

the government's case; and (3) the declarant has not been shown to be unavailable.

Appellant's claim is without merit. Indeed, he concedes that this argument was rejected in *United States v. Wolfe,* 766 F.2d 1525 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1379, 89 L.Ed.2d 602 (1986). In *Wolfe,* this court held that statements that fall within the hearsay "exception" created by Fed.R.Evid. 801(d)(2)(E) bear adequate indicia of reliability to be admitted without depriving a defendant of his constitutional right to confrontation. *Id.* at 1527. Appellant, however, urges this court to "re-examine" the *Wolfe* ruling. Assuming *arguendo* that this panel were inclined to agree with appellant's view of the sixth amendment requirements, we would not be free to overrule a prior decision by this court. Only a decision by this court sitting en banc or by the United States Supreme Court can overrule a prior panel decision.[11] As for appellant's claim that the confrontation clause requires a showing of unavailability of the declarant prior to admission of coconspirator statements under Fed.R.Evid. 801(d)(2)(E), the United States Supreme Court recently expressly rejected any such requirement. *United States v. Inadi,* —— U.S. ——, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

## IV. DENIAL OF MANOTAS'S SEVERANCE MOTION

Manotas's next argument is that the trial court erred in denying his motion for severance because appellant's joint trial denied him the benefit of exculpatory testimony from his codefendant, appellant Gaviria-Aguirre. Manotas contends that the trial court abused its discretion in denying the severance motion because Gaviria-Aguirre's testimony was critical in rebutting the coconspirator statement that was admitted at trial against him.[12]

---

10. Because we find no error in the trial court's admission of the coconspirator statements under *James,* we do not reach the issue of whether error in admitting the statement might have been harmless.

11. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981). Nothing in *Bonner* or

subsequent cases supports appellant's suggestion that this rule does not apply when the challenged panel decision was decided on the non-argument calendar by a per curiam opinion.

12. *See supra* note 8.

**1544**

■ The trial court's denial of Manotas's motion for severance is reviewable only for an abuse of discretion. *United States v. Pruitt,* 763 F.2d 1256, 1263 (11th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986). We have articulated standards to guide trial judges in exercising this discretionary power. A defendant who moves for severance in order to enable him to obtain favorable testimony from a codefendant must show: (1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial. *Id.; United States v. Leichtman,* 742 F.2d 598, 605 (11th Cir.1984); *United States v. Johnson,* 713 F.2d 633, 640 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977). Once the defendant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion. *Pruitt,* 763 F.2d at 1263; *Johnson,* 713 F.2d at 641; *Rice,* 550 F.2d at 1369.

■ We find no abuse of discretion in the court's denial of Manotas's severance motion. First, Gaviria-Aguirre's testimony would not have had sufficient exonerative significance. Gaviria-Aguirre's affidavit indicated that he was prepared to testify: (1) that assuming the alleged conspiracy, Gaviria-Aguirre "never knew, heard or spoke to, or had any reason to think" that Manotas was involved; (2) that Gaviria-

Aguirre has reason to believe that Manotas was not involved in any respect; and (3) that Gaviria-Aguirre knows of no drugs ever having been supplied by or through Manotas. Assuming that the jury would believe Gaviria-Aguirre's testimony, the most that can be said is that the testimony would tend to rebut any implied direct connection between Gaviria-Aguirre and Manotas raised by Longo's telephone conversation with "Fernando."[13] Although we agree with Manotas that such an implied connection may have been raised by admission of the coconspirator statement, this connection was secondary to the conspiracy link between Manotas and Longo. The government did not allege or attempt to prove that Gaviria-Aguirre personally directed Manotas's actions or even that Gaviria-Aguirre knew Manotas. *See United States v. Rice,* 550 F.2d 1364, 1370 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 478, 54 L.Ed.2d 312 (1977). No such connection is necessary for Manotas to be convicted as a coconspirator given the evidence regarding Manotas's direct involvement with Longo. Accordingly, Gaviria-Aguirre's testimony would have had little exculpatory effect even if it were believed.[14]

In addition, even if Manotas's initial showing was adequate, the trial court did not abuse its discretion in denying the severance motion on the basis of the second set of factors. Gaviria-Aguirre's testimony would not have gone very far in advancing Manotas's theory that his sale of cocaine to Longo was an isolated incident and that Manotas had no knowledge of a conspiracy. The minimal prejudice to Manotas was outweighed by considerations of judicial administration and economy in this circumstance.

13. The connection between Gaviria-Aguirre and Manotas was implied when Muñoz heard Longo repeat what "Fernando" allegedly told him regarding the location for the pick-up of the one kilogram of cocaine and the fact that it would be a Camaro. *See supra* note 8.

14. Gaviria-Aguirre's affidavit did not in any way contravene his own penal interests. Although

testimony in contravention of the witness' penal interests is not required in every case before a severance may be granted, the trial court may consider the fact that such testimony "lack[s] a certain amount of credibility." *United States v. Johnson,* 713 F.2d 633, 641 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984).

## V. LIMITATIONS ON CROSS–EXAMINATION

Appellant Gaviria-Aguirre alleges that the trial court unduly restricted the scope of cross-examination of the "pivotal" government witness: Carlos Muñoz. Appellant's argument is based upon Fed.R. Evid. 608(b) and 609(a). First, appellant contends that the trial court should have permitted him to conduct a more detailed cross-examination of Muñoz's prior criminal conviction.[15] Second, appellant argues that he should have been permitted to call several witnesses who allegedly had been victims of Muñoz's embezzlement and drug dealing.

■ The trial court's limitations on the scope of cross-examination were entirely consistent with Fed.R.Evid. 608(b) and 609(a).[16] Appellant does not contend that this is a case of such serious restrictions on cross-examination as to "eviscerate the defendant's sixth amendment right to confront adverse witnesses and compel the reversal of a conviction." *United States v. Haimowitz*, 706 F.2d 1549, 1559 (11th Cir. 1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 1069, 79 L.Ed.2d 212 (1984). The sixth amendment requires that a defendant be granted an opportunity to explore criminal charges against a prosecution witness on cross-examination in order to bring the witness' possible motive or self-interest to the jury's attention. *United States v. Garrett*, 727 F.2d 1003, 1011 (11th Cir.1984), *aff'd on other grounds*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). Where the defendant is permitted to conduct sufficient cross-examination to satisfy sixth amendment requirements, the scope of any further cross-examination is within the sound discretion of the trial court and the trial court's decision will not be disturbed on review absent an abuse of discretion. *Id.; United States v. Tolliver*, 665 F.2d 1005, 1008 (11th Cir.), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).

■ The trial court did not abuse its discretion in refusing to allow further cross-examination concerning Muñoz's criminal conviction. The court allowed a considerable amount of cross-examination of Muñoz. The jury learned of Muñoz's conviction for bringing illegal aliens into the United States in connection with the Mariel boatlift for which Muñoz was sentenced to thirty-two months imprisonment. The jury was informed of the agreement between the United States and Muñoz under which DEA agents agreed to recommend that Muñoz's sentence be reduced to probation if Muñoz cooperated. The jury heard that Muñoz received $10,000 cash as a reward for his work on this case.

---

**15.** Appellant's brief provides little guidance as to what cross-examination limitations are being challenged. With respect to Muñoz's criminal conviction, appellant alleges only that cross-examination was limited to specific prior criminal acts. Appellant asserts that detailed cross-examination "in these areas" would have shown Muñoz's "prior history and ability to lie, create stories to suit his own best interests and manipulate people." Neither Fed.R.Evid. 608(b) nor rule 609(a) requires that such a "witch-hunt" type cross-examination be allowed.

**16.** Fed.R.Evid. 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed.R.Evid. 609(a) states the general rule for impeachment by evidence of conviction of crime:

For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

■ The trial court also properly refused to allow Gaviria-Aguirre to call witnesses to testify regarding specific incidents of Muñoz's past conduct. Fed.R. Evid. 608(a) states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility ... may not be proved by extrinsic evidence." *See United States v. Cohen,* 631 F.2d 1223 (5th Cir.1980).

## VI. SUFFICIENCY OF EVIDENCE

### A. Gaviria-Aguirre

Appellant Gaviria-Aguirre contends that the trial court erred in denying his motion under Fed.R.Crim.P. 29 for judgment of acquittal on the charge of unlawful possession of a firearm in the commission of a felony and on the charge of conspiracy to possess cocaine with intent to distribute. The test for reviewing a denial of a motion for judgment of acquittal on the basis of insufficiency of evidence is the same as that used for reviewing general challenges to sufficiency of evidence to support a jury verdict. *United States v. Rackley,* 742 F.2d 1266, 1271 (11th Cir.1984).[17] Under that standard, we examine the evidence in a light most favorable to the government and determine whether a reasonable jury could have concluded beyond a reasonable doubt that the defendant was guilty. *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *Id.*

We address the rule 29 motion on the weapons charge first.

■ In order to have violated 18 U.S.C. § 924(c)(2),[18] appellant's act of carrying the firearms must, in and of itself, have violated federal, state, or local law. *United States v. Rouco,* 765 F.2d 983, 996 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); *United States v. Risi,* 603 F.2d 1193 (5th Cir.1979). Appellant contends that his possession of the guns was not unlawful under Florida law [19] because the weapons were neither concealed nor in easy access. The critical determination on this argument is whether, viewing the evidence in the light most favorable to the government, a reasonable jury could not have found beyond a reasonable doubt that Gaviria-Aguirre violated Florida law.

■ Gaviria-Aguirre's possession of the firearms was illegal under Fla.Stat.Ann. § 790.01(2) (West 1986) only if: (1) the firearms were "concealed firearm[s];" [20] and (2) the firearms were "on or about" Gaviria-Aguirre's person. In *Ensor v. State,* 403 So.2d 349 (Fla.1981), the Florida Supreme Court addressed the requirements of section 790.01. First, with respect to the concealment element, the court held that "absolute invisibility" is not a necessary element to a finding of concealment. The firearm need only be hidden from the ordinary sight of another person:

> The term "ordinary sight of another person" means the casual and ordinary observation of another in the normal associations of life. Ordinary observation by a person other than a police officer

---

**17.** The original panel opinion in *United States v. Rackley,* 724 F.2d 1463 (11th Cir.1984), is superseded by the opinion on rehearing, *United States v. Rackley,* 742 F.2d 1266 (11th Cir.1984).

**18.** 18 U.S.C. § 924(c) provides:

(c) Whoever—

. . . . .

(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall, in addition to the punishment provided for the commission of such felony, be sen-

tenced to a term of imprisonment for not less than one year nor more than ten years.

**19.** The government apparently concedes that Gaviria-Aguirre's carrying of firearms was not unlawful under federal or local law. The government argues that Gaviria-Aguirre violated Fla.Stat.Ann. § 790.01(2) (West 1986).

**20.** Fla.Stat.Ann. § 790.01(2) (West 1986) defines "concealed firearm" as "any firearm ... which is carried on or about a person in such a manner as to conceal the firearm from the ordinary sight of another person."

does not generally include the floorboard of a vehicle, whether or not the weapon is wholly or partially visible.

*Id.* at 354.

Second, as to the "on or about the person" requirement, the court stated that "[t]his generally includes the interior of an automobile and the vehicle's glove compartment, whether or not locked." *Id.* The *Ensor* court noted, however, that in all instances common sense must prevail and the ultimate decision must rest upon the trier of fact under the circumstances of each case. The court held that the question of whether section 790.01 was violated where a handgun was discovered partially under the mat on the floor of the passenger side of the defendant's vehicle was for the jury to decide.

■ The jury might reasonably have found beyond a reasonable doubt that both elements of a section 790.01 violation existed in this case. Gaviria-Aguirre drove the rental car to the meeting with Muñoz and Longo. Two handguns were found on the passenger side floor area of Gaviria-Aguirre's car. One of the guns was in a pouch, the other was lying uncased on top of the pouch. The record indicates that "just one part" of the uncased gun was under the seat. On these facts, the jury could reasonably have found beyond a reasonable doubt that Gaviria-Aguirre carried a concealed firearm on or about his person in violation of Florida law.[21]

Gaviria-Aguirre also contends that, even if he violated Florida law by carrying a concealed weapon in his automobile to his meeting with Muñoz and Longo, he did not carry a concealed weapon "during the commission of any felony for which he may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(2). When Gaviria-Aguirre arrived at the meeting, the guns remained in the car while Gaviria-Aguirre met with Muñoz and Longo in the parking lot. With Gaviria-Aguirre's permission, Longo drove the car to the U-Haul where Muñoz inspected the cocaine. Longo then drove the car back to where Gaviria-Aguirre was waiting in the parking lot. Muñoz and Longo exited the vehicle, and the arrests occurred. At no point after arriving at the parking lot did Gaviria-Aguirre re-enter his vehicle, and the guns remained on the floor of the car throughout.

The government apparently concedes that once Gaviria-Aguirre exited his vehicle, he did not, from that point until he was arrested, carry the firearms "on or about his person." Instead, the government argues that Gaviria-Aguirre was already committing the felonies of conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute when he drove to the January 6 meeting. Therefore, Gaviria-Aguirre had carried a firearm during the commission of a felony simply by driving his vehicle to the shopping mall.

■ Although we find no case from this jurisdiction on point, we conclude that a reasonable jury could have found Gaviria-Aguirre guilty of a section 924(c)(2) violation when he drove to the shopping mall. Viewing the evidence in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt that Gaviria-Aguirre was guilty of the felonies of conspiracy and possession at the time he drove to the mall. Nothing in the statute, precedent or reason mandates that the "any felony" language in section 924(c) be read as excluding the felonies of possession of narcotics with intent to distribute or conspiracy to possess narcotics with intent to distribute.[22] Other circuits that have addressed this question have rejected such a restrictive reading of section

---

21. We note that, although the issue was not raised on appeal, the trial court should have instructed the jury on the concealment requirement in addition to the "on or about the person" requirement of Florida law.

22. Neither of these predicate felonies contain their own enhancement provisions so as to bar conviction under both § 924 and the predicate felony. *See Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).

924.[23] We conclude, therefore, that the denial of the motion for judgment. of acquittal must be affirmed because a reasonable jury could have found beyond a reasonable doubt that: (1) Gaviria-Aguirre possessed cocaine and had formulated the intent to distribute at the time he drove to the mall;[24] and (2) a conspiracy existed to sell cocaine and Gaviria-Aguirre's act of driving to the mall was in furtherance of the conspiracy.

■ There is ample evidence to support the denial of the motion for judgment of acquittal on Gaviria-Aguirre's conspiracy count. Evidence at trial indicated that Gaviria-Aguirre met with Muñoz and Longo on January 5. At that meeting, Gaviria-Aguirre introduced Muñoz to Cabrera, the man who owned the cocaine. Gaviria-Aguirre apologized to Muñoz for the delays and promised that the deal the next day would be "sharp" with no more mistakes. The next day Gaviria-Aguirre arrived at the scene of the cocaine deal. He met with Muñoz and Longo and told them where the cocaine was located. At the U-Haul truck, Machado admitted that the men there were "Fernando's men." Viewing this evidence in a light most favorable to the government, there is little question that Gaviria-Aguirre knew of the conspiracy and voluntarily joined in it.

### B. Appellants Victorero, Manotas, and Machado

Appellants Victorero, Manotas, and Machado all present challenges to the sufficiency of the evidence to support their convictions. Appellants were all convicted on the conspiracy count, which requires proof that a conspiracy existed and that the defendant knew of the conspiracy and voluntarily joined in it. *United States v. Cotton,* 770 F.2d 940, 944 (11th Cir.1985). We conclude that the evidence was sufficient for the jury to find beyond a reasonable doubt that a conspiracy existed.

■ Appellant Victorero's insufficiency of evidence claim is without merit. Victorero rode with Longo and was present at meetings between Longo and Muñoz on a number of occasions. Victorero assented to Longo's assertion that Victorero would serve as a middleman for cocaine deals and that Victorero would know what to do if Muñoz didn't pay when Victorero delivered cocaine. Victorero arrived early at the scene of the January 6 deal and was observed conducting counter-surveillance activities while carrying a handgun. Victorero attempted to flee when he saw DEA agents arresting Gaviria-Aguirre, Longo, and Muñoz.

Victorero's contention that the crucial testimony against him came from uncorrob-

**23.** The Seventh Circuit faced similar issues in *United States v. Johnson,* 658 F.2d 1176 (7th Cir.1981). In *Johnson,* undercover DEA agents removed defendant Johnson's gun from his holster on two occasions when Johnson arrived to sell cocaine. The deals were consummated and the agents returned the gun to Johnson as they left. On appeal from his § 924 conviction, Johnson argued that he did not carry a firearm "during the commission of [the] felony" because the agents removed the pistol on each occasion prior to the consummation of the sale of cocaine. The court disagreed. Citing the legislative purpose to stem the growing use of firearms, the court concluded:

[I]t is undisputed that at some time on each of the two occasions when the cocaine was sold, Johnson was armed. Also it is undisputed that prior to being disarmed Johnson had formulated the intent to distribute the cocaine and had engaged in acts in furtherance of the distribution. ... Exclusion of Johnson from the statute would contravene the purpose of

the statute—that is, decreasing the use and carrying of firearms in felony cases. Up to the time the gun had been removed Johnson was engaged in felonious activity and his possession of the gun posed a danger to those individuals involved in the drug transaction. *Id.* at 1181.

The Fifth Circuit also upheld a § 924 conviction on conspiracy grounds alone where the defendants attempted to sell imitation narcotics. *United States v. Pietri,* 683 F.2d 877 (5th Cir. 1982).

**24.** Constructive possession will sustain a conviction for possession with intent to distribute under § 841(a)(1). *United States v. Rackley,* 742 F.2d 1266 (11th Cir.1984). In this case, the jury could reasonably have found Gaviria-Aguirre to have been in constructive possession of the cocaine in the U-Haul at the time he drove to the shopping mall.

orated testimony of a confidential informant [25] ignores the fact that DEA agents observed Victorero sitting at the meetings between Muñoz and Longo and DEA agents observed Victorero's counter-surveillance activities. Victorero also testified at trial and took the risk that the jury would not believe his plea of innocent presence. *Cotton*, 770 F.2d at 945.

■ Appellant Machado also testified at trial regarding his ignorance of any drug transaction and his innocent presence at the U-Haul containing ten kilograms of cocaine. The jury was entitled to disbelieve his testimony and rely upon the testimony that Machado was guarding the U-Haul, his statement that he was one of Fernando's men, and his relationship to Gaviria-Aguirre.[26]

■ Our discussion in section II above of appellant Manotas's *James* issue, although governed by a different standard of review, applies to Manotas's sufficiency of evidence claim. Viewing the evidence in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt that Manotas was aware of the conspiracy and knowingly joined in it by selling cocaine to Longo. The jury did not need to find that Manotas knew Gaviria-Aguirre, Machado, or Victorero in order to find that Manotas knowingly joined in the conspiracy. *See United States v. Garcia*, 721 F.2d 721, 725 (11th Cir.1983).

The district court's judgment is AFFIRMED on all issues.

---

**25.** Appellant identifies two portions of Muñoz's testimony as "crucial" to Victorero's conviction. First, Muñoz testified that Victorero "nodded and laughed" when Longo said that Victorero would know what to do if Muñoz didn't pay. Second, Muñoz testified that after the arrest when he got in the DEA van, Victorero told him not to talk. This testimony was of very questionable significance in light of the substantial amount of other evidence available.

**26.** Machado was Gaviria-Aguirre's brother-in-law.