**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald M. FUNT, Randy Webman,**
**Thomas John Harvey,**
**Defendants–Appellants.**

No. 87–5849.

United States Court of Appeals,
Eleventh Circuit.

March 22, 1990.
As Amended May 15, 1990.

**1290**

Laura H. Sayet, Miami, Fla., for Ronald M. Funt.

Christopher A. Grillo, Ft. Lauderdale, Fla., court appointed, for Thomas John Harvey.

Alvin E. Entin, Miami, Fla., for Randy Webman.

Dexter Lehtinen, U.S. Atty. and Norman A. Moscowitz, Asst. U.S. Atty., Miami, Fla., for the U.S.

Before FAY and KRAVITCH, Circuit Judges, and CASTAGNA *, District Judge.

KRAVITCH, Circuit Judge:

A fraudulent coin sales scheme formed the underlying basis for convictions on various counts of mail and wire fraud, interstate transportation of stolen property, and

---

\* Honorable William J. Castagna, U.S. District Judge for the Middle District of Florida, sitting by designation.

conspiracy in violation of 18 U.S.C. §§ 1341, 1343, 2314, and 371, respectively. On appeal defendants raise multiple claims of error. Webman, the architect of the scheme, Harvey, his able assistant, and Funt, (unfortunately for him) their faithful employee, argue that the evidence was not sufficient to support their convictions, that the district court abused its discretion in evidentiary rulings, and that the district court erred, when imposing sentence, in its finding as to the amount involved in the fraudulent scheme. Webman alone raises an ineffective assistance of counsel claim, and Funt alleges error in the district court's denial of his motion for severance. Concluding that these contentions do not merit reversal, we affirm.

## THE FACTS

Randy Webman, the prime mover behind the fraudulent scheme, previously had run coin operations that had gone "out-of-business" still owing customers money. In mid–1980, he and Thomas Harvey opened a new business, Intercontinental Coin Exchange (ICE), with a lone office in North Miami Beach, and Funt began work there in late 1980. To convince customers of ICE's reliability, the defendants falsely assured potential buyers that ICE had been in business for almost four years. ICE purported to sell investment grade Morgan silver dollars, and in fact initially many customers received the quantity and quality of coins they ordered, but soon ICE started to fall behind in filling its orders, a fact it concealed from its new customers despite promising optimistic delivery schedules. Not only were the coins late in arriving, but ICE began sending out lower grade silver dollars, a particularly deceitful practice as the difference in coin quality was not discernible by the naked eye but required expert appraisal. ICE created a "market" for silver dollars, and issued ever-increasing weekly quotes of the "market" value of the coins, at which ICE was willing to sell more coins or repurchase coins from those who had previously bought. This "market" price was concocted by Webman, and bore no relationship to any actual market pressures. ICE even-

tually stopped filling its new orders, although it continued to accept payment for future deliveries of coins. ICE accepted coin returns, and assured customers that the repurchase payments would be forthcoming. For a time ICE attempted to live up to the grandiosity of its "intercontinental" appellation by opening short-lived franchises, including one in Palm Beach. Those ventures closed, but ICE continued dealing with the franchise customers.

As cash flow pressures increased, ICE offered a new investment to those victims to whom ICE owed money: they could purchase $5,000 shares in Continental Fiscal, Inc. (CFI) by rolling over the money due them. In addition, ICE marketed shares in CFI to new customers. Funt, as the government concedes, knew nothing of the over-grading of the coins, but unfortunately he went along with ICE's other fraudulent representations and continued to lull customers even after it had become clear that money being received was spent on luxuries for Webman and Harvey although no coins were being sent out for the benefit of the customers. Eventually this conduct caught up to them, and no later than May 1982, ICE shut its doors, disconnected its phone, and disappeared.

At trial Webman was convicted on all 24 counts that went to the jury, including mail fraud, wire fraud, conspiracy, and interstate transportation of stolen property (ITSP); Harvey was acquitted on two of those counts, one each of mail fraud and ITSP. Funt, who was only charged in six counts, was found guilty on two counts of mail fraud and one count of wire fraud, but was acquitted on two mail fraud counts and conspiracy.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

In reviewing a challenge to the sufficiency of the evidence this court must take the evidence in the light most favorable to the government. *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974). Credibility choices and the weighing of evidence must be re-

solved in favor of the jury's verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In short, so long as a reasonable juror could conclude that the evidence, viewed with all reasonable inferences drawn in favor of the government, established the defendant's guilt beyond a reasonable doubt, then the conviction will withstand a sufficiency challenge. It is not necessary, however, that every hypothesis of innocence be disproven as the jury "is free to choose among reasonable constructions of the evidence." *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983) (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir., Unit B 1982) (en banc) (discussing history of sufficiency of the evidence standard in the Fifth Circuit), *aff'd.*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)); *see also United States v. Sawyer*, 799 F.2d 1494, 1501 (11th Cir.1986), *cert. denied*, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987). In cases of fraud, "[i]t is often difficult to prove fraudulent intent by direct evidence, and it must be inferred from a pattern of conduct or a series of acts 'rather aptly designated as badges of fraud.'" *United States v. Amrep, Corp.*, 560 F.2d 539, 546 (2nd Cir.1977) (citations omitted), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978).

■ The government must prove "three elements to establish a violation of 18 U.S.C. § 1341: (1) The accused participated in a scheme or artifice to defraud; (2) The defendant 'caused' a use of the mails; (3) The mailing was for the purpose of executing the scheme." *United States v. Hewes*, 729 F.2d 1302, 1320 (11th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985); *see also Sawyer*, 799 F.2d at 1501–02. It is well established that "lulling" letters may constitute execution of the scheme. *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *Hewes*, 729 F.2d at 1353; *United States v. Toney*, 598 F.2d 1349 (5th Cir. 1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct.

706, 62 L.Ed.2d 670 (1980)[1]; *United States v. Ashdown*, 509 F.2d 793, 800 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975). The rule of this circuit, analogous to conspiracy law, is that "so long as one participant in a fraudulent scheme causes a use of the mails in execution of the fraud, all other knowing participants in the scheme are legally liable for that use of the mails." *Toney*, 598 F.2d at 1355. Moreover, the use of the mails need not have been foreseeable to the convicted schemer. *Id.* at 1355 n. 10.

The elements of wire fraud under section 1343 are analogous: "scheme, use of interstate communications, such as a telephone, and criminal intent to defraud." *United States v. Cowart*, 595 F.2d 1023, 1031 n. 10 (5th Cir.1979).

### A. Funt: Sufficiency of the Evidence

Funt alleges that the evidence was insufficient to convict him of mail and wire fraud. Having reviewed the evidence in the light most favorable to the government, we conclude that a reasonable juror could have found Funt guilty beyond a reasonable doubt.

#### 1. The Howard Transaction

Funt was convicted on Count One of receiving a letter for the purpose of executing the scheme to defraud. The letter from Allan Howard contained a check in payment for coins that Howard never received. Funt contends that his only connection with Howard was a lulling letter Funt sent to Howard and one telephone conversation, both subsequent to the receipt of Howard's check. Funt contends that he had no connection with the receipt of the check or the solicitation of it, and therefore cannot be convicted under mail fraud.

##### a) Effect of the Jury Acquittal on Conspiracy

■ Funt argues that because he was acquitted of the conspiracy, the jury must

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

not have believed he was part of the scheme, and therefore he should not be held liable for actions of his co-schemers of which he had no knowledge and with which he had no involvement. Acquittal on the conspiracy count, however, does not mean that the jury necessarily rejected the government's proof of Funt's involvement in the scheme. To the contrary, the jury's guilty verdict on the mail fraud count belies Funt's assertion. Inconsistent jury verdicts are not necessarily cause for reversal. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) (acquittal may reflect exercise of lenity). Moreover, the fraudulent scheme and the conspiracy were not coterminous, and the jury consistently could have acquitted on conspiracy while convicting on mail and wire fraud as the elements of the two offenses differ. In fact, the conspiracy inter alia alleged interstate transportation of stolen property, whereas Funt was not convicted on that substantive count. The ITSP could have been what the jury found lacking to convict Funt of conspiracy. The conspiracy acquittal is not contrary to a guilty verdict on mail fraud.

### b) Elements of the Offense

■ The Howard letter was in furtherance of the fraud, *cf. Toney,* 598 F.2d at 1354–55 (mailing from victim caused by defendants), and there is evidence that Funt was actively involved in ICE operations, selling coins to investors and making excuses for the company's delays in delivery. The Howard letter was sent to ICE's West Palm Beach Office which was a franchise of the main ICE operation in Miami. Funt contends that he might have been liable for the later lulling of Howard, but argues that there is no evidence of any connection he had with the Palm Beach franchise office at the time of the receipt of the Howard letter.[2] Funt's own testimony, however, was that ICE provided sales literature, coins, and customer lists to the Palm Beach franchise. The Palm Beach franchise sent a check to the Miami office in payment for Howard's coins, but no coins were sent to Palm Beach or to Howard.

The trial court specifically instructed the jury not to consider against Funt testimony by various ICE customers, such as Pilla and Howard, about the Palm Beach franchise. Therefore, much of the evidence the government contends supports Funt's conviction was not properly before the jury when it convicted Funt.

Nevertheless, the evidence admitted against Funt showed that the Palm Beach franchise used the promotional materials prepared by ICE in Miami, received the benefit of previously developed customer lists and ongoing advertising campaigns including quotations of Webman's "market" price, and purchased coins through ICE. ICE Miami maintained customer files and sent statements of holdings to customers, and, significantly, ICE Miami retained control over the supply of coins. Moreover, Funt knew of and assisted the franchise connection.

■ Regardless of whether or not the Palm Beach franchise was defrauded, ICE Miami failed to deliver the promised and paid for coins. As a consequence those customers who had ordered and paid for coins were defrauded. It was foreseeable that ICE Palm Beach would solicit payments by mail and receive payment by mail as a result of the representations made by the schemers. ICE Miami cannot insulate itself from its fraudulent acts by use of an intermediary, even if the intermediary has

---

**2.** Funt concedes that lulling may give rise to liability under the mail and wire fraud statutes. *See United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Hewes,* 729 F.2d 1302, 1321 (11th Cir.1984); *United States v. Ashdown,* 509 F.2d 793, 799–800 (5th Cir.1975); *cf. United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (distinguishing *Sampson* ). As we find that the initial misrepresentations made in the sales literature sent to the Palm Beach franchise were sufficient for a jury to convict Funt of mail fraud for the Howard mailing, we need not reach the issue of whether or not his subsequent lulling would permit the jury to infer a previous intent to defraud.

no fraudulent intent.[3] Funt was associated with ICE Miami during the relevant time period, and the jury was entitled to disbelieve his testimony that he had no knowledge that the coins would not be supplied as promised. Additionally, Funt was aware of the misrepresentations contained in the sales literature, including the false statement that ICE had been in business approximately three and one half years. Thus, Funt had knowledge of the fraudulent representations made, as part of the scheme, to the Palm Beach franchise with the foreseeable result that customers would be defrauded.

■ Funt argues that he had no actual knowledge of the Howard letter, did not receive it and did not cause it to be sent, and that he was totally disassociated from the Palm Beach franchise. However, the law is clear that one need not personally mail or receive mail in order to be liable under mail fraud so long as co-schemers do so.[4] *United States v. Dynalectric, Co.*, 859 F.2d 1559, 1578 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989); *United States v. Johnson,* 700 F.2d 699, 701 (11th Cir.1983) (per curiam); *Toney,* 598 F.2d at 1355; *cf. Hewes,* 729 F.2d at 1323–33 (liability for wire fraud where communications foreseeably made by others). Although Howard's testimony that his letter was in response to Palm Beach's solicitation could not be considered by the jury against Funt, nonetheless there was abundant evidence of Funt's connection with the scheme and its misrepresentations. Having become one of the schemers he was vicariously liable for their causing the use of the mails.

### 2. Madelyn Morman Transaction

■ Madelyn Morman ordered and received coins from ICE. When, according to ICE's "market" statement, her "investment" had appreciated significantly, she returned her coins to ICE, was given a receipt, and was assured that payment for her coins would be forthcoming. It never was. Funt argues that because he had limited personal contact with Morman he cannot be liable. He asserts that he did not make the "pitch" to Morman, and did not send or approve the sending of the lulling statement to Morman stating that her coins had increased in value, although there was evidence that Funt signed the receipt when she returned her coins. Personal involvement, as noted above, is simply not required after a defendant has involved himself in a fraudulent scheme. He is liable for the acts of his co-schemers. *Toney,* 598 F.2d at 1355. His conviction is supported by the evidence, and the jury reasonably could have inferred Funt's intent to defraud, despite the fact that his personal contacts with Morman were limited. At the time Funt accepted the return of Morman's coins, ICE was having difficulty covering expenses and honoring its obligations. Funt kept that crucial information to himself, and in so doing defrauded Ms. Morman.

### 3. Grindstaff Transaction

■ Here Funt made a pitch to a personal friend, Grindstaff. Funt attempted to protect Grindstaff, dissuading him from making a larger initial investment and attempting to deliver coins to Grindstaff despite the fact that others were ahead of him on the list of orders to be filled. Nonetheless, Grindstaff was told no more than other customers about the actual history of ICE and its inability to deliver coins on the schedule promised in the sales literature and by Funt orally. Grindstaff wired payment to ICE for his coins, and that wiring satisfies the communication requirement of section 1343. There was evidence that when Funt solicited and lulled Grindstaff that Funt knew the coins would not be

---

**3.** We need not and do not decide whether the franchise offices were or were not knowing and willful participants in the fraudulent scheme. Even if the franchises were innocent intermediaries, that would not cleanse ICE of the fraud. *United States v. Georgalis,* 631 F.2d 1199 (5th Cir. Unit B 1980).

**4.** Conspiracy and mail fraud are not the same offense, and the fact that Funt was acquitted of conspiracy is not inconsistent with his being a member of a more limited mail fraud scheme.

delivered. Furthermore, it is clear that the same initial misrepresentations were made to Grindstaff as to other victims. That provides the requisite basis of fraud upon which the jury could convict. Despite the fact that Funt was concerned about Grindstaff and attempted to send the coins, Grindstaff's money was taken from him under false and fraudulent pretenses, and therein lies the fraud.

### B. Harvey: Evidentiary Objections and Sufficiency of the Evidence

In the guise of arguing sufficiency of the evidence, Harvey asserts that but for three evidentiary errors by the district court, there would have been insufficient evidence to convict him. The standard we apply to evidentiary review is abuse of discretion, *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir.1987), and we conclude that the trial court did not abuse its discretion in making its evidentiary rulings. First, the court properly admitted evidence going to Webman's intent, and Harvey was not unduly prejudiced by any spillover effect. Second, it was proper to admit coconspirator testimony against Harvey. Harvey contends that there was no independent evidence to support the existence of the conspiracy and that coconspirator statements alone are insufficient to prove a conspiracy. We need not reach Harvey's latter assertion as we find, upon reviewing the record, that there was independent evidence provided by the victims themselves to support the existence of the conspiracy and Harvey's membership in it. Third, Harvey complains of the stricken testimony by the various accountants which the jury was instructed to disregard. We conclude that the district court acted properly in striking the testimony and giving the jury appropriate instructions. No mistrial was required.

■ Finally, Harvey asserts that evidence about the franchise offices was improperly admitted hearsay because there was no evidence that the franchise offices were acting as agents of ICE's Miami Office. His claim, however, is meritless. The trial court was not clearly erroneous in finding that the statements made by the franchise either were "authorized" or were statements by an agent as the franchise agreement provided for strict supervision by the principal and required the franchise to adhere to the principal's standard operating procedure. The testimony regarding the franchise sales was necessary to explain why ICE Miami accepted the return of coins which it had not sold. Moreover, Harvey has not specifically pointed to a single instance of alleged hearsay that was prejudicial to him. Because we find all Harvey's evidentiary claims to be meritless, we reject his contention that correction of the alleged errors would result in an insufficiency of evidence against him.

## II. THE STRICKEN BULLOCK TESTIMONY

■ Both Harvey and Webman complain of the testimony of FBI agent Bullock. Bullock testified about the benefits and perquisites received by Harvey and Webman, and explained the summaries of business records he had prepared. Nonetheless, after several days of testimony, the trial court discovered that Bullock's testimony was based upon hearsay information obtained in violation of the court's sequestration order, and struck his testimony, instructing the jury to disregard it. The district court denied motions for mistrial.

This court will not overturn a district court's refusal to grant a mistrial where curative instructions were given, "unless the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Tenorio–Angel*, 756 F.2d 1505, 1512 (11th Cir.1985) (quoting *United States v. Slocum*, 708 F.2d 587, 598 (11th Cir.1983)).[5]

---

5. In cases such as *United States v. Ruz–Salazar*, 764 F.2d 1433 (11th Cir.1985) and *United States v. Benz*, 740 F.2d 903 (11th Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985) (cited by appellant in his supplemental brief), the court properly refused to grant a mistrial where the comments presented to the jury were spontaneous and singular. Here, however, the stricken government testimony was much more extensive; nonetheless, we do

Here the district court's performance was exemplary: it gave explicit curative instructions, followed by an individual poll of the members of the jury to make sure they understood and would adhere to the court's ruling. Moreover, the stricken evidence was merely summarization of documents already in evidence, and therefore the potential for prejudice was slight. Accordingly, we do not disturb the district court's refusal to grant a mistrial.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Webman claims that he was denied effective assistance of counsel because his investigator quit as the result of the government threatening to subpoena him as a witness due to accusations that he was tampering with a witness. Pretermitting any consideration of whether or not the Sixth Amendment was implicated, we note that Webman has made no showing of actual prejudice as is required under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and accordingly we affirm the district court's denial of Webman's mistrial motion.

## IV. THE POTENTIALLY PERJURED BRADFORD TESTIMONY

Bradford was an accountant called by Webman. Bradford testified that an associate had prepared the chart reflecting coin orders and deliveries and that Bradford had reviewed the chart, comparing it to the customer files. During the government's cross-examination, it became apparent that Bradford was either lying or had been extremely slipshod. Defense counsel was informed that Bradford in fact had not supervised the chart; in turn, the defense lawyers told the court that they were concerned that the witness was committing perjury. The court instructed the jury not to consider Bradford's testimony against Harvey, and granted Funt a continuance to obtain another accountant. Webman's motion for a mistrial was denied. Webman

now argues that he was entitled to a mistrial because, through no fault of his own, perjured testimony infiltrated the trial, prejudicing him and resulting in a miscarriage of justice.

The purpose of a trial is to ferret out the truth, and cross-examination serves that goal by revealing the weaknesses of a witness's testimony. In this case, cross-examination by the government uncovered dramatic deficiencies in the accountant's testimony. Federal Rule of Evidence 607 permits a party to impeach his own witness, and Webman was free to do that here in an attempt to reestablish his credibility with the jury. He could have called another accountant, and then argued to the jury to disregard Bradford's testimony as unworthy.

Instead, in reliance on *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir.1964) Webman argues that because a prosecutor's knowing use of perjured testimony may require a mistrial, similarly he should be entitled to a mistrial. In *Barbee*, however, the problem was that the government had failed to disclose ballistics tests to defense counsel which would have permitted the defendant to show that the gun entered into evidence by the government was not the one used in the commission of the crime.[6] Here, however, the defendant put into evidence the testimony of which he now complains. This is not a case where the defendant is ambushed by the government, but instead a case where the defendant ill-advisedly chose to present evidence which was subject to devastating impeachment. In an adversary system, absent governmental misconduct affecting the evidence, a defendant must accept the consequences of the evidence he offers. Had the defense adequately prepared and examined Bradford and his proposed testimony, the defense would not have permitted Bradford to take the stand and suffer such

---

not think that it rose to the level of requiring a mistrial.

**6.** *Cf. United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir.1979) (discussing prosecutorial use of perjured testimony and distinguishing *Barbee*).

impeachment.[7]

## V. FUNT'S REQUEST FOR SEVERANCE

During the seventh week of trial, based on Harvey's affidavit, Funt moved for a severance so that he could benefit from the allegedly exculpatory testimony of Harvey outlined in that affidavit. The district court denied the motion. The granting of severance is committed to the sound discretion of the trial court, and will not be disturbed absent an abuse. To obtain a severance on the ground that a codefendant will testify favorably, a defendant must show: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed have testified at a separate trial." *United States v. Machado*, 804 F.2d 1537, 1544 (11th Cir. 1986). Points one and three are interrelated in that there can be no bona fide need for testimony which is not materially helpful to the defendant's theory of defense. If the defendant satisfies those four threshold requirements, then the trial court must: "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion." *Id.*

In ruling on Funt's severance motion, the trial court was "not persuaded as to the exculpatory nature of the contents of Defendant Harvey's affidavit," and the court further "express[ed] grave concern and reservation that Defendant Harvey would in fact testify for Defendant Funt at a separate proceeding." Because we cannot say that the trial court's finding that Harvey would not testify was clearly erroneous, we do not address the trial court's finding that the affidavit was not exculpatory, nor do we rule on the second half of the analysis alternatively employed by the trial court as we agree that Funt did not cross the initial threshold.

According to Harvey's affidavit, the substance of the testimony he would give at a severed trial is as follows: First, that Funt was an executive vice president "in name only," that Funt had no "major decision making authority within the company with regard to questions of who was to receive coins, who was not to receive coins, which bills were to be paid and which bills were to be left unpaid," and that Funt wrote the December 1981 lulling letter based on Harvey's and others' representations that "it was our intention that coins ultimately would be delivered."

Second, the affidavit related that as to the "Greinstaff" (sic) transaction, Funt had collected 100 coins for Grindstaff, but Harvey had taken them back to send to other customers.

Third, the affidavit declared that in February 1982 Harvey and other ICE executives told Funt that the financial problems of the company were being dealt with and there was a possibility that business would return to normal by the beginning to middle of March.

Fourth, the affidavit stated that Funt relied on the foregoing representation in lulling Thompkins, and fifth, that Funt had no knowledge of or control over CFI's funds.

We need not consider the fourth assertion of the affidavit as Funt was not convicted on the Thompkins count. Similarly, the fifth assertion of the affidavit is now immaterial as Funt was not convicted on any count concerning CFI. Although CFI was alleged to be one of the means used in furtherance of the mail fraud scheme, it did not feature in either the defense or prosecution case as to the counts upon which Funt was convicted.

---

**7.** Webman also contends that the trial judge should have conducted an evidentiary hearing to determine conclusively whether or not Bradford was committing perjury. Webman tenders no authority for that proposition, and we find it to be without merit. The defendants, Webman included, had the opportunity to impeach Bradford and call other witnesses to demonstrate the reliability of Bradford's testimony for the benefit of the jury. It would be a perversion of adversary process to permit a party to obtain a mistrial based on his own evidence.

Although some of the information may be exculpatory, nonetheless we affirm the district court's refusal to grant a severance as we conclude that the district court's factual finding that Harvey would not testify at a separate proceeding was not clearly erroneous. Harvey made clear that he would not testify at a trial where he was a defendant. He also said that if he were severed and Funt continued his trial that Harvey was willing to testify and be subjected to cross-examination only if the court made favorable evidentiary rulings on the scope of government cross-examination as to Rule 404(b). Harvey testified various times for the limited purpose of establishing the conditions attached to his offer to testify. As a result there was sufficient evidence from which the district judge could find that the only circumstance under which Harvey would testify fully was if he continued to judgment and Funt were severed out and tried separately and subsequently. An offer to testify, conditioned upon being effectively removed from jeopardy or upon future evidentiary rulings, does not satisfy the fourth *Machado* threshold prong when the district court concludes that the defendant will not in fact testify. We therefore affirm the district court's decision.

Funt also argues that at least Harvey's affidavit should have been admitted. We hold, however, that the court's refusal to admit the Harvey affidavit was not an abuse of discretion. Funt offered the affidavit under Rule 804(b)(3) and (5) as an exception to the hearsay bar, but the judge found the affidavit untrustworthy. The affidavit was not so inculpatory as to Harvey that it constituted a statement against interest within the meaning of Rule 804(b)(3). Although implicit in the affidavit's description of Funt's participation is an assertion that the affiant had knowledge of the internal operations of ICE, the affidavit admits no criminal knowledge or intent, nor does it tend to show that Harvey committed any apparently illegal acts. Furthermore, the circumstances surrounding the making of the affidavit show that Harvey did not expect the affidavit to be admitted against him as it was solely for the purposes of Funt's severance motion, and therefore, even if somewhat facially inculpatory, Harvey would not have felt any real threat of inculpation. We see no other extraordinary guarantee of trustworthiness which would cause us to find the affidavit admissible under Rule 804(b)(5).[8]

## VI. SENTENCING

The appellants were not sentenced under the Sentencing Guidelines, but under pre-guidelines law. Harvey, Webman and Funt complain that the district court erred in finding the total amount of the fraud as the gross receipts from customers. The Pre-sentence Investigation Report (PSI) stated, under the rubric of the Victim Impact Statement, that the total loss suffered was $849,000, a sum representing the gross receipts of ICE (including the CFI "investment" vehicle). The defendants contend that because many customers received valuable coins, the value of those coins delivered to the customers should be subtracted from the total sum to determine the amount of actual loss to the victims.

The sentence imposed is committed to the discretion of the trial court and, so long as the sentence falls within the range provided by statute, generally will not be reviewed on appeal. *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855 (1974); *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Restrepo,* 832 F.2d 146, 148 (11th Cir.1987); *United States v. Weaver,* 884 F.2d 549, 551 (11th Cir.1989) (per curiam); *United States v. Pruitt,* 763 F.2d 1256, 1264 (11th Cir. 1985), *cert. denied,* 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986). The defendant has the right, however, not to be sentenced on the basis of erroneous information or assumptions, and a claim that this right has been violated is the proper subject of

**8.** As the district court's decision was adequately grounded on evidentiary concerns, we need not reach the issue of whether Harvey's fifth amendment rights were waived or would have been implicated by admitting the affidavit.

review on appeal. *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948) (erroneous assumption of prior convictions); *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589; *United States v. Castillo–Roman,* 774 F.2d 1280, 1283 (5th Cir.1985); *United States v. Tobias,* 662 F.2d 381, 388 (5th Cir. Unit B 1981), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

▬ Although it is uncontested that the sentences imposed by the district court are within the range provided for by statute, appellants contend that the district court imposed sentence based upon an erroneous calculation of victim impact contained in the PSI. Under Fed.R.Crim.P. 32(c)(3)(D), when a defendant alleges a factual inaccuracy in the PSI, the district court must either make a written factual finding on the contested matter or a determination that no such finding is necessary as the matter will not be taken into consideration in sentencing. In this case, the district court made written findings addressing the objections to the PSI: in some instances the court ordered the PSI corrected, in others the court stated that it would not consider the controverted matter, and in still other instances, such as the amount of victim impact, the court made a written finding.

Despite the allegations of the appellants, the PSI itself along with the district court's memorandum decisions and orders on the objections to the PSI demonstrate that sentence was not imposed based on erroneous facts or assumptions.[9] The PSI stated that 72% of the customers received their coins while only 8% received no coins. The district court was aware of the actual factual predicate for sentencing, and the sentencing memorandum discusses why the district court adhered to the global receipt figure to approximate the total amount of the fraud. Although the PSI's Victim Impact Statement placed the victim's loss at $890,000, the district court was well aware that many of the victims had received their

coins. The district court, however, reasoned that all money received by the schemers was obtained by fraud, that is every dollar paid to ICE by the victims was received by ICE as the result of fraudulent representations. Moreover, regardless of the value of the coins delivered to some of the victims, the victims paid for and expected investment grade coins, not the more common lower grade coins. As the court noted, a coin investor might have no use whatsoever for a lower graded coin than he had bargained for and could have difficulty selling the coin for the amount ICE paid its supplier. The district court believed that the best measure of the victim impact was the lost opportunity for appreciation which the victims would have enjoyed had they invested their money in a non-fraudulent investment vehicle. The district court noted that such opportunity costs were not certain, but indicated that the schemers should not benefit from the uncertainty wrought by their own wrongdoing. In the instant case, the court's sentence was not based on an inaccurate assumption or false information, but rather was the court's reasoned judgment as to the harm perpetrated by the fraudulent scheme.

▬ Funt, joined in this specific position by Harvey at oral argument, makes a more subtle claim. He was not aware of the over-grading of the coins, a fact that the government concedes, and argues that he should not be responsible at all for the coins that were actually delivered (although over-graded) because he had no knowledge of the over-grading and believed that no wrong had been done the victims. We disagree. As the district court noted, *all* the sales were induced by fraud, and, having engaged in fraud, Funt must bear the risk of the ultimate ramifications of the crime. The Victim Impact Statement does not consider the knowledge of the defendant, but rather looks at the actual harm suffered by the victim. In a mail fraud scheme, one of the schemers may not even

9. We note that the government has borne its burden of proof as to the factual allegations. *Compare United States v. Benefield,* 889 F.2d 1061 (11th Cir. 1989) ("some reliable proof")

*with United States v. Alston,* 895 F.2d 1362 (11th Cir.1990) (citing preponderance of the evidence cases with approval). Under either rubric, the government's proof was sufficient.

know of the existence of one of the victims, yet that victim is harmed by the fraud, and Rule 32 provides that such victim impact is to be presented in the PSI.

 Funt makes another argument: he was acquitted by the jury on three of the six counts of which he was charged, and he argues that the amount of victim impact should be reduced accordingly. Financial loss incurred by the victims is not, however, an element of the offenses of which he was acquitted, and the acquittals do not therefore preclude the district court from considering the harm resulting from the overall scheme in which the defendant participated. Moreover, a sentence may be imposed based on a wide range of considerations, including, for example, conduct for which the defendant has not been indicted. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 1081, 93 L.Ed.2d 1337 (1949); *Houle v. United States*, 493 F.2d 915, 915 (5th Cir.1974). Furthermore, an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing sentence. *Billiteri v. United States Board of Parole*, 541 F.2d 938, 944 (2d Cir.1976); *United States v. Atkins*, 480 F.2d 1223, 1224 (9th Cir.1973) (per curiam); *United States v. Sweig*, 454 F.2d 181, 184 (2d Cir.1972). In conclusion, we affirm the sentences.

 Appellants raise another concern relating to the PSI. Even if their sentences are not subject to reversal, appellants argue that the amount of victim impact is adversely affecting their parole eligibility, and that the district court erred in failing to correct the PSI to reflect a lower amount. The accuracy of the PSI is important, and the right of defendants to lodge objections to alleged factual inaccuracies in the PSI contributes to insuring the accuracy of the PSI's information. *United States v. Jones*, 856 F.2d 146, 149 (11th Cir.1988). The right on the part of the defendant to object and the duty on the part of the court to make a finding do not, however, provide the defendant with a means to circumvent the administrative appeal process by which parole decisions are contested. Rule 32 does not require that the district court

make a factual finding as to all matters contained within the PSI, but only as to those which the defendant contests and upon which the court relies in imposing sentence. Thus, the court of appeals may consider the information relied upon by the district court in imposing sentence when reviewing allegations that the sentence was imposed in reliance upon erroneous information or assumptions.

Although the new Sentencing Guidelines do not provide for parole, the Parole Board continues to exist until 1992 and is required to set parole dates for all persons who will be in its jurisdiction at the time the Commission ceases to exist. Furthermore, the Parole Commission must set the release date "early enough to permit consideration of an appeal of the release date, in accordance with Parole Commission procedures, before the expiration of five years following the effective date of this Act." Pub.L. No. 98–473, § 235, 98 Stat. 2032 (1984). The Parole Commission procedures provide for a hearing, and one of many sources of information considered is the PSI to which is attached, as required by Rule 32, the judge's written findings. The Commission is thus alerted to the dispute, and may then "rely upon such information only to the extent that it represents the explanation of the facts that best accords with reason and probability." 28 C.F.R. § 2.19(c).

 This court has emphasized the role of the PSI in parole decisions. In *United States v. Jones*, the court declared the importance of an accurate PSI as it is "used by the Board of Prisons or the Parole Commission to determine the eventual release date of a defendant. Rule 32(c)(3)(D) is designed to ensure that factual information about a defendant in a PSI is accurate, so that future decisions about his penal treatment, based—at least in part—on PSI information, will also be fair and correct." 856 F.2d at 149. In *United States v. Davis*, 881 F.2d 973 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 735, 107 L.Ed.2d 753 (1990), the court of appeals reviewed the district court's factual finding as to the PSI. *Davis*, however, was a Guidelines case, and there was no Parole

Commission to subject the PSI and accompanying objections to further review. If a defendant believes the district court's finding on the defendant's objection to the PSI's factual statements demonstrate that the district court imposed sentence based upon an erroneous understanding of the facts, the defendant should appeal to this court as such an error would implicate the legality of the sentence imposed. We have concluded that such is not the situation here. Where the defendant complains that the factual allegations of the PSI will be erroneously interpreted and thus adversely affect his parole eligibility, however, he should first pursue his administrative remedies through the Parole Commission. *United States v. Legrano*, 659 F.2d 17, 18 (4th Cir.1981); *Rosati v. Haran*, 459 F.Supp. 1148, 1159–60 (E.D.N.Y.1977). At this point, the claim as to adverse impact on parole is not yet ripe. In fact, it has barely been brought before this court by conclusory statements in the brief, without benefit of discussion of authorities or the status of the appellants in the Parole Commission proceedings.[10]

As we conclude that the sentences were appropriately imposed and Rule 32 was adhered to, our inquiry is at an end. The appellants can raise their objections before the Parole Commission as to the amount of the property involved in the fraud. We review final decisions of the district court, not prospective decisions of the Parole Commission.

## CONCLUSION

The denouement of a tale of fraud provides little satisfaction for anyone. Here not only were the victims deceived, but some of the co-schemers were manipulated as well, underscoring the peril of participating in a fraud: by definition one's partners are not to be trusted. As we conclude that

none of the claims raised merits relief, we AFFIRM.

---

10. In fact, the appellants have not specifically directed the attention of this court to what provisions of law or regulation are adversely affecting the parole decision. We assume that appellants complain of their classification under 28 C.F.R. § 2.20, Subchapter D, 331. As we hold that this appeal is the improper avenue, the appellants' complaint as to the internal workings of the Parole Commission is not of the essence. We note, however, without passing on or intimating any view of the merits, that subsection 331 relating to fraud offenses does not refer to the loss suffered by the victim, but rather to the "value of the property" involved. Indeed, § 2.20, Chapter 13 notes that "[f]or offenses graded according to monetary value (e.g., theft) ... the severity rating is based on the amount or quantity involved...."