UNITED STATES of America, Plaintiff,

v.

Jeffrey AUGUST, Defendant.

No. 91–80093.

United States District Court, E.D. Michigan, S.D.

Nov. 19, 1991.

Jonathan Tukel, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

James L. Feinberg, Detroit, Mich., for defendant.

MEMORANDUM OPINION AND ORDER OVERRULING DEFENDANT'S QUANTITY AND EQUATION OBJECTIONS TO THE PRESENTENCE REPORT

GADOLA, District Judge.

### FACTS

Defendant Jeffrey A. August was indicted on 14 counts, including: unlawful distribution of controlled substances [Count 1], possession with intent to distribute controlled substances [Counts 2–13] and unlawful failure to maintain records regarding controlled substances [Count 14]. Defendant was convicted on Counts 2 through 14 but was found not guilty on Count 1. Count 1 included a quantity of 99 gallons of a Schedule III controlled substance, hydrocodone. Counts 2 through 13 included quantities of approximately 19.75 gallons total that were also at issue in Count 1.

The presentence report uses the 99 gallon figure to arrive at a base offense level of 26. The defendant objects and states that the 19.75 gallon figure, the figure upon which the jury convicted him "beyond a reasonable doubt," should be used to arrive at a base offense level of 22.

Further, the defendant finds fault with the Schedule III Substances table in the sentencing guidelines, as it equates 1 ml of hydrocodone with 1 mg of heroin or 1 gm of marihuana.[1] Defendant claims that this equation violates his rights to equal protection and due process under the fifth amendment of the U.S. Constitution.

## QUANTITY ISSUE

■ Section 1B1.3(a) of the Sentencing Guidelines states in relevant part:

> the base offense level where the guideline specifies more than one base offense level ... shall be determined on the basis of the following:
>
>     \*    \*    \*    \*    \*    \*
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction. . . .

Application Note 2 to the Commentary following U.S.S.G. § 1B1.3 states in relevant part:

> For example, where the defendant engaged in three drug sales of 10, 15, and 20 grams of cocaine, as part of the same course of conduct or common scheme or plan, subsection (a)(2) provides that the total quantity of cocaine involved (45 grams) is to be used to determine the offense level *even if the defendant is convicted of a single count charging only one of the sales.*

(Emphasis added). Further, the Background Section to the Commentary following U.S.S.G. § 1B1.3 states in relevant part:

> ... in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction.

The Sixth Circuit has stated that "an acquittal does not bar a sentencing court from considering the acquitted conduct in imposing sentence." *United States v. Moreno*, 933 F.2d 362, 374 (6th Cir.1991) (quoting *United States v. Funt*, 896 F.2d 1288, 1300 (11th Cir.1990)). The Sixth Circuit has further stated that the district court must make a determination as to the quantity of drugs for which the defendant will be held responsible.

> We believe that the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible. If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate.

*United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.1990) (emphasis in original); *see also United States v. Elrod*, 898 F.2d 60, 62 (6th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 104, 112 L.Ed.2d 74 (1990); *United States v. Lazarchik*, 924 F.2d 211, 214 (11th Cir.1991). Such a determination is a finding of fact which will be accepted by the court of appeals unless clearly erroneous. *See United States v. Barrett*, 890 F.2d 855, 867 (6th Cir.1989).

This court agrees with the government's position. Count 1, with its 99 gallon quantity limit, was proven by a preponderance of the evidence, but not beyond a reasonable doubt. Because this court believes that defendant possessed 99 gallons of the controlled substance at issue, then this court should include the 99 gallons into defendant's sentencing. By doing so, de-

---

**1.** *See* United States Sentencing Commission *Guidelines Manual* § 2D1.1 at 2.52 (Nov. 1, 1990) [hereinafter "U.S.S.G." or "Sentencing Guidelines"].

fendant's base offense level will be raised to level 26.

## EQUATION ISSUE

■ Hydrocodone cough syrup, the controlled substance set out in the indictments, is shown in the Schedule III substances tables of the Sentencing Guidelines:

```
1 ml liquid hydrocodone  =  1 gm marihuana
1 gm solid hydrocodone   =  0.5 gm heroin
                         =  500 mg heroin
```

Codeine cough syrup, a pharmacological near-equivalent, is shown in the Schedule V substances table of the Sentencing Guidelines:

```
1 gm liquid codeine   =  12.5 gm marihuana
1 gm solid codeine    =  0.08 gm heroin
```

The Sentencing Guidelines establish that 1 milliliter (ml) equals 1 gram (gm).

Defendant uses these tables to show that the Sentencing Guidelines assume that the dilution factor of hydrocodone from solid to liquid is 1:500. The *Physician's Desk Reference* 908 (1991) [hereinafter "PDR"] shows, as defendant asserts, that there is a 1:1 ratio between solid and liquid.[2] Defendant therefore concludes that this "wide discrepancy" bears no rational basis to any pharmacological equivalency between the drugs.

Defendant also attaches a copy of Goodman and Gilman's *The Pharmacological Basis of Therapeutics* 497 (1990) [hereinafter "Goodman"], which indicates the relative strengths of dosages of hydrocodone and other narcotics. Goodman indicates that hydrocodone cough syrup is between even to four times as potent as codeine cough syrup.[3] The PDR indicates that the

potency ratio of hydrocodone cough syrup to codeine cough syrup is from 1:1 to 2:1.[4] Defendant claims that if these comparisons are true, then the Sentencing Guidelines should treat hydrocodone and codeine cough syrups on a 1:1 to 4:1 ratio, not on the 80:1 ratio now used. Again, defendant claims that such a huge discrepancy bears no rational basis.

This appears to be an issue of first impression. There are cases that discuss the constitutionality of the Sentencing Guidelines, but these cases draw their conclusions from the statutory language and legislative history that were the genesis of the suspect drug equation. *See, e.g., United States v. Buckner*, 894 F.2d 975 (8th Cir. 1990) (1:100 ratio between cocaine base and cocaine); *United States v. Lewis*, 762 F.Supp. 1314 (E.D.Tenn.1991) (equation of one marihuana plant equalling one kilogram of marihuana); *United States v. Osburn*, 756 F.Supp. 571 (N.D.Ga.1991) (same). There are few cases that even acknowledge that hydrocodone appears in the Sentencing Guidelines as a controlled substance. *See Lazarchik*, 924 F.2d at 212–13 (discussing the amounts of hydrocodone cough syrup to use in sentencing); *United States v. Gurgiolo*, 894 F.2d 56, 60 (3d Cir.1990) (same); *United States v. Milicia*, 769 F.Supp. 877, 879 (E.D.Pa.1991) (same). There is no administrative language addressing or explaining the rationale behind the Sentencing Guidelines equations as they pertain to hydrocodone. There is language in the Sentencing Guidelines that states that "the ratios in the

---

**2.** This is derived from the PDR's differing descriptions of Hycodan tablets and cough syrup. Hycodan is a tradename of the generic hydrocodone medication. The PDR indicates that each tablet and each spoonful contains 5 ml of hydrocodone. The recommended dosage for the solid is one tablet every 4 to 6 hours. The recommended dosage for the cough syrup is one teaspoon every 4 to 6 hours. Equating the two substances, hydrocodone solid and liquid are on a 1:1 ratio under the PDR.

**3.** Goodman looks at codeine cough syrup and hydrocodone cough syrup in oral antitussive doses. Goodman equates 10 to 20 mg of codeine cough syrup every 4 to 6 hours with 5 to 10 mg of hydrocodone cough syrup every 4 to 5

hours. Taking the equivalent most favorable to defendant, hydrocodone and codeine cough syrups are on a 1:1 ratio. Taking the equivalent most favorable to the government, hydrocodone and codeine cough syrups are on a 4:1 ratio.

**4.** Here defendant compares Hycomine, a tradename hydrocodone cough syrup, to Calcidrine, a tradename for codeine cough syrup. The PDR recommends that 5 ml of Hycomine be taken every 4 hours and that 5 to 10 ml of Calcidrine be taken every 4 hours. Taking the equivalent most favorably to defendant, hydrocodone and codeine cough syrups are on a 1:1 ratio. Taking the equivalent most favorably to the government, hydrocodone and codeine cough syrups are on a 2:1 ratio.

Drug Equivalency Tables do not necessarily reflect dosages based on pharmacological equivalents." Commentary, U.S.S.G. § 2D1.1, at 2.49 (Nov. 1, 1990). However, this language solves nothing, it only begs the question.

Counsel for the government states that the discrepancies in the Sentencing Guidelines occur because Congress has stated that a Schedule II drug, pure hydrocodone, has a higher potential for abuse than hydrocodone cough syrup, a Schedule III drug. "Schedule III drugs have the potential of 'moderate or low physical dependence or high psychological dependence,' 21 U.S.C. § 812(b)(3)(C), whereas Schedule II drugs have the potential of 'severe psychological or physical dependence.' 21 U.S.C. § 812(b)(2)(C)." [5] Further, the government states that Congress found it more likely that a person would overdose on a small solid hydrocodone compound than on a bulky liquid cough syrup. This seems very plausible and wholly rational.

The discrepancy between hydrocodone cough syrup and codeine cough syrup is also based upon a congressional finding of differences in abuse potential and addictive traits. Hydrocodone cough syrup is a Schedule III drug while codeine cough syrup is a Schedule V drug. Schedule III drugs have a currently accepted medical use in the United States and the potential for abuse less than those drugs in Schedule I or II, and such abuse may lead to moderate or low physical dependence or high psychological dependence. 21 U.S.C. § 812(b)(3). Schedule V drugs have a currently accepted medical use in the United States and low potential for abuse relative to those drugs in Schedule IV, and such abuse may lead to limited physical or psychological dependence relative to those drugs in Schedule IV. 21 U.S.C. § 812(b)(5).

Congress affirmatively placed codeine cough syrup in Schedule V knowing codeine cough syrup's potential for abuse and its addictive traits. 21 U.S.C. § 812(c) (Schedule V)(1). Congress placed hydrocodone cough syrup on Schedule III knowing

that drug's higher potential for abuse and its more addictive traits. 21 U.S.C. § 812(c) (Schedule III)(3), (4), (5). The Sentencing Commission promulgated the Sentencing Guidelines and its amendments pursuant to its authority under 28 U.S.C. § 994(a), (o), (p), (x). The equations involving hydrocodone cough syrup were properly promulgated and noticed. See 54 Fed. Reg. 9122, 9137 (1989); 52 Fed.Reg. 18046, 18065 (1987). The equations followed the statutorily mandated schedules and these schedules' differing penalties as set out in 21 U.S.C. § 841(b)(1)(D), (3) (a Schedule III drug infraction will garner up to a five year term of imprisonment while a Schedule V drug infraction will draw up to a one year term of imprisonment). The difference in ratios has occurred because of Congress' informed treatment and placement of the two drugs.

Congress affirmatively placed hydrocodone and codeine cough syrups on different schedules. Congress gave its reasons for treating these drugs differently.

> [Courts] review acts of Congress with considerable deference. Acts do not offend principles of substantive due process if they bear a "reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory." *Nebbia v. New York*, 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940] ... (1934).... [C]ourts should not and do not try "to determine whether [the statute] was the correct judgment or whether it best accomplishes Congressional objectives; rather, [courts] determine [only] whether Congress' judgment was rational."

*Buckner*, 894 F.2d at 978, *quoted in United States v. Abrams*, 943 F.2d 52 (6th Cir.1991) (unpublished decision). The Sentencing Commission applied the law as Congress intended.

> [T]he construction given to a statute by those charged with its administration is entitled to great deference.... Congress ... granted broad authority guided by specific goals and principles. A review of the Commission's policy state-

5. Government's Resp. at 3.

ments reveals the high degree of study and deliberation with which the Commission undertook their task of following the congressional directive.... In light of such well-reasoned statutory interpretation and implementation, [the court] find[s] that the Commission acted will within its broad grant of authority and pursuant to congressional goals and principles.

*United States v. White*, 869 F.2d 822, 827 (5th Cir.1989) (citations omitted); *see United States v. Baker*, 883 F.2d 13, 15 (1st Cir.1989). Because these decisions were reached on informed bases, and the reasons given are rational, this court will not hold that the Sentencing Guidelines are unconstitutional.

### ORDER

For the foregoing reasons, it is hereby ORDERED that defendant's objections are OVERRULED.

SO ORDERED.