[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 9, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10663
Non-Argument Calendar

_____

D. C. Docket No. 04-00181-CR-T-27-EAJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TODD MAYO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 9, 2006)**

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Todd Mayo appeals his convictions for mail fraud, in violation of 18 U.S.C.§ 1341, and forgery, in violation of 18 U.S.C. § 513(a).[1] On appeal, he argues that the evidence is insufficient to sustain either conviction. For the reasons set forth more fully below, we affirm.

We review the sufficiency of the evidence de novo, "viewing the evidence in the light most favorable to the government." United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005). We also make all reasonable inferences and credibility choices in favor of the government and the jury's verdict. Id. We must affirm "unless, under no reasonable construction of the evidence, could the jury have found the [defendant] guilty beyond a reasonable doubt." Id. "The evidence need not exclude every hypothesis of innocence or be completely inconsistent with every conclusion other than guilt because a jury may select among constructions of the evidence." U.S. v. Bailey, 123 F.3d 1381, 1391 (11th Cir. 1997).

Mayo ran two companies, Pacific Capital Corporation ("PCC") and Security Trust Income Fund, LLC ("STIF"), which loaned private investor money to borrowers and secured the loans with real estate, placing deeds of trust on the properties. Mayo's investors included Robert Peck, his brother, David Peck, and

---

[1] Mayo was charged with four counts of mail fraud, one count of transportation of stolen property, and one count of forgery. The district court granted Mayo's motion for judgment of acquittal as to one of the mail fraud counts, and the jury acquitted Mayo on two of the remaining mail fraud counts and the transportation of stolen property count.

2

Morton Myerson. All three invested in STIF. Mayo's convictions are based upon a PCC check representing the return of Robert Peck's $225,000 principal investment in PCC. This check contained a forged endorsement, and the bank stamps on the back of the check came from another PCC check. A copy of this check was mailed to Robert Peck in December 2000.

On appeal, Mayo challenges the mail fraud conviction, arguing that the evidence does not establish a scheme to defraud, but conversion of legally obtained funds and acts designed to forestall discovery of a simple theft. He further argues that the jury verdict demonstrates that the government failed to prove a scheme to defraud regarding STIF investments. He contends that the theory that the mailing lulled investors does not make sense because no reasonably prudent person would rely upon the canceled check. In addition, Mayo asserts that the only purpose of the cancelled check would be to alert Peck that something was wrong, and, therefore, does not amount to mail fraud.

"Mail fraud consists of the following elements: '(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme.'" United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (citation omitted). "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material

3

facts reasonably calculated to deceive persons of ordinary prudence." United States v. Hasson, 333 F.3d 1264, 1270-71 (11th Cir. 2003) (citations omitted).[2] "While a mailing is a required element of a § 1341 claim, the use of the mails need not be an essential element of the scheme; for a mail fraud conviction, it is sufficient if the government shows that the mailing was 'incident to an essential part of the scheme' or 'a step in the plot.'" United States v. Lee, 427 F.3d 881, 887 (11th Cir. 2005), cert. denied, 126 S.Ct. 1447 (2006) (citation omitted). The defendant need not personally mail the item, but need only cause a use of the mails. United States v. Funt, 896 F.2d 1288, 1292, 1294 (11th Cir. 1990); see also United States v. Toney, 598 F.2d 1349, 1355 (5th Cir. 1979) ("One 'causes' the mails to be used when he 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'") (citation omitted).

The mailings can occur after the goods are fraudulently obtained "if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" United States v. Lane,

_____

[2] Although Hasson is a wire fraud case, "[t]he 'scheme or artifice to defraud' and 'for the purpose of executing' language in the mail and wire fraud statutes are construed identically." Hasson, 333 F.3d at 1271 n.7.

4

474 U.S. 438, 451-452, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) (citation omitted). Letters that are designed to conceal the fraud by lulling the victim into inaction or that are designed to allay suspicions are actionable under the fraud statute. United States v. Georgalis, 631 F.2d 1199, 1204-05 (5th Cir. Unit B 1980). One "common element in the 'lulling' cases is that the lulling devices comprised a fundamental part of the basic scheme and its desired continued perpetration." Henderson v. United States, 425 F.2d 134, 143 (5th Cir. 1970).

The evidence is sufficient for a jury to find a scheme to defraud STIF investors.[3] Mayo explained that, although he had a number of pending transactions from which he was expecting revenue, he was experiencing a short-term cash-flow problem between approximately April and June 2000. There is sufficient evidence for the jury to find that Mayo was seeking additional funds to get PCC and STIF (and himself) through the cash-flow crisis, and that he secured such funds from Myerson and the Pecks by misrepresenting how he intended to use the money. As evidence of his intent to defraud, the evidence shows that Myerson, Robert Peck, and David Peck invested in STIF during the time that STIF and PCC were in a

[3]Acquittal by the jury on the other mail fraud counts does not demonstrate that the evidence of a scheme to defraud was insufficient, as the jury could have acquitted for other reasons. Funt, 896 F.2d at 1293. In addition, the verdict is not necessarily inconsistent, as the jury could have found that there was a scheme to defraud, but that the checks in the remaining two counts — payment of interest to PCC investors — were not mailed in furtherance of the scheme to defraud.

5

cash-flow crisis. They all believed that their money would be used for investment purposes. Mayo did not give David Peck any reason to believe that things were not going well, his money was at risk, or he would not receive interest payments. He did not give Myerson any reason to think that his money was at risk, and did not tell Myerson that he was experiencing a cash-flow crisis or that he would use the money to pay expenses.

The use of the STIF investor funds provides further evidence of Mayo's scheme to defraud. Both of Robert Peck's checks were deposited directly into PCC's bank account, and, after Myerson's $250,000 investment and David Peck's $5,000 investment were deposited in STIF's bank account (which previously had a balance of $27,839.53), a total of $199,000 was transferred from the STIF account to the PCC account. This money helped Mayo pay expenses and interest to other investors including: (1) $63,000 that went to Mayo's personal accounts, (2) $25,000 toward a premature balloon payment on property he purchased from William Welch, which appeared to be used as both an office and residence, and (3) $100,000 transferred to another corporate account for which Mayo was the only authorized agent. Mayo also used some of the money in the STIF account to make interest payments to other investors.

There is also sufficient evidence for the jury to find that Mayo caused the

mailing of the copy of the check to Robert Peck by directing Lori Mayo, who worked as an office manager/bookkeeper, to do so. Although Lori Mayo appeared to do the actual mailing, Robert Peck requested the check from Mayo. In the days before sending the check, Mayo told Robert Peck that he would send the check by fax and Federal Express.

In order to find that the mailing of the copy of the check was in furtherance of the scheme to defraud STIF investors, the jury would have to infer that the mailing was intended to lull the investors into a false sense of security regarding these investments. To reach this inference, the jury could find that Mayo knew that the check was fraudulent and that he had previously tried to cast suspicion away from himself. As evidence of Mayo's knowledge, he made multiple statements that the check had cleared the PCC account and claimed to have a copy of the bank statement. He also made multiple statements casting suspicion on Lincoln Trust. The jury could also infer such knowledge based on: (1) the length of time during which Mayo insisted that the check had cleared the PCC account, particularly as Mayo continued to insist that the check had cleared the account despite evidence that he had in his possession two different versions of the check,[4] (2) Mayo's

---

[4] Copies of the copy of the check mailed to Robert Peck and the check photocopied by David Peck were admitted into evidence. Although the front of both copies appears to be identical, the back of the checks are not — the "Bob Peck" endorsement is different, and the bank stamps are in different locations. Based on the date on the fax, Robert Peck faxed his copy

statement that he brought the check to NationsBank and was told that it did not clear the NationsBank account, as NationsBank became Bank of America in 1998, and the check was a NationsBank/Bank of America check, and (3) Mayo's statement that the check may have cleared a different account when he was confronted with evidence that it never cleared the PCC account, as he had previously claimed. The jury could also disbelieve Mayo's statements to the effect that he did not forge the check, and, thereby, infer that the opposite was true. See United States v. Hasner, 340 F.3d 1261, 1272 (11th Cir. 2003) (holding that a jury can disbelieve a witness and infer that the opposite of his testimony is true).

It follows that the jury could reasonably infer that Mayo's intent in providing Robert Peck with a copy of the canceled check was to make him believe that PCC had issued a check for his investment principal and to induce him to investigate other reasons for the missing funds, thereby diverting suspicion that Mayo was engaged in any wrongdoing. Both of the Pecks were involved in investigating this check. If either of them questioned the propriety of Mayo's handling of Robert Peck's PCC investment, it is logical that they would also question Mayo's handling of their STIF investments. Therefore, the jury could

---

of the check back to Mayo on February 16, 2001. When Mayo met with David Peck on February 22, 2001, David copied the other version of the check. Mayo continued to insist that the check had cleared the PCC account into April 2001.

8

reasonably infer that, in seeking to allay suspicions regarding Robert Peck's PCC investment, Mayo also intended to lull the Pecks into a false sense of security regarding their STIF investments. Accordingly, there is sufficient evidence to support Mayo's conviction for mail fraud.

As to his forgery conviction, Mayo does not challenge the sufficiency of the evidence that the check was a forged security of an organization, but argues that the evidence was not sufficient to establish his responsibility for the forgery or his intent to deceive.

> Whoever makes, utters or possesses a counterfeited security of a State or a political subdivision thereof or of an organization, or whoever makes, utters or possesses a forged security of a State or political subdivision thereof or of an organization, with intent to deceive another person, organization, or government shall be fined under this title or imprisoned for not more than ten years, or both.

18 U.S.C. § 513(a). Thus, there must be sufficient evidence that Mayo: (1) made, uttered, or possessed; (2) a forged security; (3) of an organization; (4) with intent to deceive another person, organization, or government. Id. § 513(a). Only the first and fourth elements are challenged on appeal.

There is sufficient evidence to allow the jury to infer that Mayo made the forgery with the intent to deceive. For the reasons that the jury could find that Mayo knew that the check was fraudulent discussed above, the jury could also find that Mayo perpetrated the forgery. The jury could also disbelieve Mayo's

9

statements to the effect that he did not forge the check, and, thereby, infer that the opposite was true. Hasner, 340 F.3d at 1272. Furthermore, because Mayo was president of PCC and Lori Mayo was a subordinate, the jury could also infer that he directed Lori Mayo to fill out the check. Despite Mayo's candor with the Pecks regarding his suspicions as to the check, the jury could also reasonably infer Mayo's intent to deceive as he made multiple statements casting suspicion on Lincoln Trust. This would support an inference that Mayo intended to deceive the Pecks into believing that he had, in fact, issued the check.

In light of the foregoing, we conclude that Mayo's convictions for mail fraud and forgery are supported by sufficient evidence. We, therefore, affirm.

**AFFIRMED.**